IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CATALDO PIRITO                    :        CIVIL ACTION
                                  :
        v.                        :
                                  :
PENN ENGINEERING WORLD            :
HOLDINGS, et al.                  :        NO. 09-2396

MEMORANDUM

Dalzell, J.                                December 22, 2011

        Plaintiff and counterclaim defendant Cataldo Pirito

("Pirito") brings this action against defendants and counterclaim

plaintiffs Penn Engineering World Holdings ("Penn World") and

Penn Engineering & Manufacturing Corp. ("Penn Engineering," and

collectively, the "Penn entities"), asserting two claims for

breach of contract -- one against each defendant.  These claims

arise out of a Share Purchase Agreement (the "Agreement")

executed in January of 2003 whereby Penn World purchased from

Pirito the outstanding capital stock of Maelux SA, a Luxembourg

corporation that owned all of the capital stock of M.A.E. S.p.A.,

an Italian corporation.

        Pirito alleges that Penn World and Penn Engineering

(which executed a Guarantee that Penn World would perform under

the Agreement) failed to sell certain real property in Offanengo,

Italy to Pirito upon his exercise of an option to purchase this

property, as the Agreement required.  The Penn entities counter

with four claims of their own against Pirito: for (1) fraud; (2) breach and lapse of the option to purchase real property; (3) enforcement of the determination of an independent public accountant; and (4) breach of contract.  The Penn entities allege that Pirito misrepresented the financial condition of Maelux SA and M.A.E. S.p.A. in violation of the Agreement.

Though Pirito filed this action in May of 2009, we stayed these proceedings for much of the ensuing time to permit the parties to try to resolve this complex dispute under the good offices of Judge Jacob P. Hart.  When these discussions failed, we restored the case to our active docket and the parties promptly started a flurry of motion practice.  We now have before us four fully briefed motions: (1) the Penn entities' motion for costs; (2) Penn World's petition to confirm arbitration award; (3) Pirito's motion to dismiss for lack of jurisdiction; and (4) the Penn entities' motion for partial summary judgment.

For the reasons set forth at length below, we will grant the Penn entities' motion for costs in part and Penn World's petition to confirm arbitration award in part.  We will deny Pirito's motion to dismiss and the Penn entities' motion for summary judgment.

2

## I.  Factual and Procedural Background

For the reasons later detailed, we will resolve the pending motions without considering in depth the merits of the parties' claims.  Instead, our decisions depend upon the language of the January, 2003 Agreement and the procedural history of the parties' efforts to arbitrate this dispute in Italy.  We will thus recite the undisputed facts as to the Agreement itself and recount the arbitration proceedings initiated before the Chamber of National and International Arbitration of Milan (the "Chamber") on March 20, 2008.

Our decision will make more sense when it is placed in the context of the parties' allegations as to their performances under the Agreement and the outcome of an arbitration initiated before the Chamber in January of 2005 -- though the parties display little agreement on these topics.  We will therefore rehearse the parties' main averments as to these topics, though we need not decide which averments to credit in resolving the pending motions.

### A.  The Undisputed Facts As To The Agreement

Pirito, an Italian citizen, resides in Brazil, Pl.'s Compl. ¶ 2; Defs.' Countercls. ¶ 1, while Penn Engineering is a

Delaware corporation with its principal place of business in Danboro, Pennsylvania, Defs.' Countercls. ¶ 6; Pl.'s Ans. to Defs.' Countercls. ("Pl.'s Ans.") ¶ 6.  Penn World is a Bermuda limited partnership, whose General Partner is Penn Engineering Holdings, Inc., Defs.' Countercls. ¶¶ 7, 9; Pl.'s Ans. ¶¶ 7, 9. Penn Engineering Holdings, Inc. is a wholly-owned, direct subsidiary of Penn Engineering.  Defs.' Countercls. ¶ 8; Pl.'s Ans. ¶ 8.

On January 23, 2003, Pirito and Penn World entered into an Agreement whereby Penn World purchased from Pirito all of the capital stock of Maelux SA.  Pl.'s Compl. ¶¶ 8-9; Defs.' Countercls. ¶¶ 16-17.  The Agreement provided that "[t]he Buyer agrees to pay to the Seller, subject to adjustment as provided in Section 2(d), a purchase price (the 'Purchase Price') by delivery of (i) cash in the amount of €7,000,000 payable to the Seller by wire transfer or delivery of other immediately available funds, [and] (ii) cash in the amount of €2,000,000 payable to the Escrow Agent by wire transfer or delivery of other immediately available funds," as well as enough funds to satisfy in part a loan that Maelux SA had taken out and an earn-out to be paid to Pirito over four years.  Ex. A.1 to Defs.' Countercls. ("Agreement") § 2(b).

The Agreement established an elaborate mechanism for
determining the consolidated net worth of Maelux SA after the
closing, id. § 2(d), and this mechanism proved sufficiently
important during the proceedings in which the parties later
participated that we will quote the relevant language of the
Agreement at length:

> Immediately after the consummation of the
> Closing hereunder the Buyer shall, at the
> Buyer's expense, engage Ernst & Young LLP to
> prepare an audited consolidated balance sheet
> of the Company (the "Closing Statement") and
> determine the consolidated net worth (i.e.,
> total assets minus total liabilities) of
> Maelux (including the Company) as of the
> close of business on the business day
> immediately preceding the Closing Date ("Net
> Worth"), which shall be prepared in
> accordance with Italian Accounting Principles
> applied on a consistent basis for all periods
> subject to the accounting standards more
> fully described on Appendix G.  Ernst & Young
> LLP shall be required to deliver the Closing
> Statement to the Buyer not later than 90 days
> after the Closing Date.  Promptly after the
> Buyer's receipt thereof, the Buyer shall
> deliver a copy of the Closing Statement to
> the Seller.  Upon receipt of the Closing
> Statement, the Seller shall give written
> notice to the Buyer within 30 days if the
> Seller disputes the Closing Statement and the
> parties shall negotiate in good faith to
> resolve such dispute. . . . If the Buyer and
> the Seller are unable to resolve such dispute
> within 15 days after the Buyer is notified
> thereof, the disputed matters shall be
> referred to an independent public accountant
> satisfactory to the Buyer and the Seller, who

shall be directed to determine the Net Worth
of the Company as of the close of business on
the business day immediately preceding the
Closing Date and the determination of such
accountant shall be binding on the parties
hereto.  If the Buyer and the Seller are
unable to agree upon an independent public
accountant, the Buyer and the Seller shall
each designate an independent public
accountant, who shall choose the independent
public accountant that will finally determine
the Net Worth of the Company as of the close
of business on the business day immediately
preceding the Closing Date.  The Buyer and
the Seller shall each pay one-half of the
cost of the services of such independent
accountant.  If and to the extent that the
Net Worth of the Company reflected on the
Closing Statement as finally determined ("Net
Worth at Closing") shall be an amount less
than €815,821 ("Minimum Required Net Worth"):
(i) the Purchase Price shall be retroactively
and immediately reduced by an amount equal to
the amount ("Net Worth Deficit") by which the
Net Worth at Closing is less than the Minimum
Required Net Worth, and (ii) an amount equal
to the Net Worth Deficit shall become
immediately due and payable to the Buyer from
the Seller, such amount being payable first
from the Escrow, and, if in excess of the
Escrow, then by the Seller.

The Agreement envisioned the prospect that Pirito would

purchase the "Real Property," meaning "land and buildings owned

by the Company in Offanengo, Italy," id. at 4, from Penn World

following the closing.  Thus, the Agreement provided that "[u]pon

delivery of a written notice" to the Seller or the Buyer "not

less than 60 days prior to the third anniversary of the Closing

Date," "the Seller shall be obligated to purchase the Real Property from the Company" and "the Buyer shall be obligated to cause the Company to sell the Real Property by the Seller" on the third anniversary of the closing date.  Id. § 2(f)(i)-(ii). Under the Agreement, however, "[i]n the event there are outstanding amounts owed at the end of the three-year period by the Seller to the Buyer for any matter with respect to this Agreement . . . the Real Property Payment Amount will be increased by such amounts, provided, however, that no increase will be made for amounts for which a claim is pending under the Escrow Agreement."  Id. § 2(f)(vii).

    The Agreement contained Pirito's representations that, (among other things): (1) certain financial statements attached to the Agreement "present fairly the financial condition of the Company and Maelux," id. § 4(d); (2) M.A.E. S.p.A. "has no liability . . . except for (i) liabilities set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (ii) liabilities that have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business," id. § 4(f); (3) "Maelux's sole assets are, and has [sic] been since its incorporation, the Company Shares.  Except for owning the Company Shares, Maelux has never conducted any business

7

activity," id. § 4(k); and (4) "[t]he inventory of the Company .

. . is merchantable and saleable in the Ordinary Course of

Business . . . and, except as set forth on Appendix H or Appendix

I, none of which is Slow Moving Inventory or Obsolete Inventory."

Id. § 4(l).

Finally, with respect to the resolution of disputes, §

13(h) states that "[t]his Agreement shall be governed by and

construed in accordance with the laws of Italy without giving

effect to any choice or conflict of law provisions or rules that

would cause the application of the laws of any jurisdiction other

than Italy."  Section 13(m) further provided that

> Except for disputes concerning the
> preparation of the Closing Statement and any
> reduction of the Purchase Price under Section
> 2(d), which shall be resolved in accordance
> with such Section 2(d), any other dispute
> arising under the indemnification provisions
> or any other provisions of this Agreement or
> the Real Property Agreement, including those
> concerning their validity, interpretation,
> performance and termination, shall be
> referred to an arbitral tribunal in Milan,
> Italy, or such other place agreed by the
> Parties hereto . . . . Judgment may be
> entered in any court of competent
> jurisdiction based upon the decision reached
> in such arbitration.

On the same day that Pirito and Penn World entered into the
Agreement, Penn Engineering executed a Guarantee, Pl.'s Compl. ¶
11; Defs.' Ans. ¶ 11, under which

> Penn Engineering & Manufacturing Corp.
> ("Parent") irrevocably guarantees each and
> every representation, warranty, covenant,
> agreement and other obligation of the Buyer,
> and/or any of its permitted assigns (and
> where any such representation or warranty is
> made to the knowledge of the Buyer, such
> representation or warranty shall be deemed
> made to the knowledge of Parent), and the
> full and timely performance of their
> respective obligations under the provisions
> of the foregoing Agreement.

Ex. B to Pl.'s Compl. ("Guarantee") at 1.

### B. **The Parties' Allegations as to Performance**

Both Pirito and the Penn entities contend that
following the closing of the transaction described in the
Agreement, the other party or parties violated it.  The Penn
entities also claim that Pirito's conduct leading up to the
closing constituted fraud.

Pirito alleges that on February 22, 2007, he notified
Penn World of his decision to exercise his option to purchase the
Real Property under § 2(f)(ii) of the Agreement, Pl.'s Compl. ¶
23, but that Penn World responded "that Plaintiff would only be
able to take title to the Real Property if Plaintiff agreed to

9

pay an additional €2,994,509 / $4,087,265 USD, which Defendant
Penn World's counsel, Mr. Dreher, claimed Plaintiff owed
Defendant, Penn World." Id. ¶ 27.  According to Pirito, "[u]nder
the terms of the Agreement governing the sale of the Real
Property, no term requires the payment of these additional monies
to Defendant Penn World." Id. ¶ 32.

The Penn entities, for their part, assert that "[o]n
July 2, 2003 Penn World gave Pirito notice of the Closing
Statement provided by Ernst & Young, consisting of the Audited
Balance Sheet of M.A.E. as of February 5, 2003, finding that
M.A.E.'s Net Worth was a negative €442,000 and the Net Worth
Deficit was approximately €1,258,000." Defs.' Countercls. ¶ 96.
The Penn entities further allege that "[a]fter years of delay by
Pirito, in October 2007, an independent public accountant, Dr.
Marcello Del Prete . . . . determined that the Net Worth was
negative €669,856 as of February 5, 2003 -- not €815,821 as
represented by Pirito." Id. ¶ 48.  The Penn entities contend
that Pirito misrepresented the Net Worth in the Agreement, id. ¶
49, and further aver that Pirito misrepresented M.A.E. S.p.A.'s
income and profit, id. ¶ 51, and the "warehouse value," which
presumably refers to M.A.E. S.p.A.'s inventory, id. ¶ 52 -- all

10

in violation of the Agreement.  The Penn entities also claim that in the spring of 2005 Pirito filed a lawsuit against Maelux SA to collect a €514,000 debt he claims Maelux SA owed him that he had created and that he had not disclosed to the Penn entities.  Id. ¶¶ 80-83.  According to the Penn entities, the existence of this debt contradicted certain of Pirito's representations in the Agreement, including that "Maelux did no business other than own the M.A.E. stock."  Id. ¶ 79.

   C.   **The Parties' Allegations As To The First Arbitration**

        According to the Penn entities, Pirito's counsel contested Ernst & Young's Net Worth Deficit calculation in July of 2003, Defs.' Countercls. ¶ 99, and the Penn entities attempted to resolve this dispute with Pirito from late July of 2003 until January of 2004.  Id. ¶ 104.  When Pirito refused to identify an independent accountant pursuant to § 2(d) of the Agreement, however, id. ¶ 133-34, the Penn entities initiated an arbitration proceeding (the "First Arbitration") in the Chamber in January of 2005.  Id. ¶ 135; Pl.'s Compl. ¶ 35.

        The Penn entities claim that before the First Arbitration panel Pirito interposed a number of challenges to the panel's jurisdiction, the validity of the Agreement, and the

11

manner in which Penn World had served him with Ernst & Young's closing statement.  Id. ¶ 136.  According to the Penn entities, in February of 2007 the Panel issued a Partial Determination "rejecting Pirito's claims that: the Arbitration Panel was not competent under the Agreement to make any decision with respect to the validity, interpretation or execution of the Net Worth provision in the Agreement; that the Net Worth provision was void and the service of the Closing Statement was untimely."  Id. ¶ 137.  The Panel, however, "found that it did not have the power to appoint an independent public accountant," id., leading Penn World to file a petition in the Court of Milan on February 22, 2007 to appoint such an accountant.  Id. ¶ 138; Pl.'s Ans. ¶ 138.

The Penn entities aver that in mid-2007, the Court of Milan "appointed Dr. Marcello Del Prete as the independent public accountant to determine the Net Worth Deficit."  Id. ¶ 140.  The parties agree that "[i]n early October 2007, Dr. Del Prete issued his report finding that the Net Worth of the Consolidated Financial Statement of Maelux was a negative €669,856 and that the Net Worth Deficit was €1,485,687."  Id. ¶ 142; Pl.'s Ans. ¶ 142.  Pirito maintains, however, that "the independent public accountant's report was seriously flawed and did not accurately calculate the Net Worth value."  Id.  In October of 2007, Penn

12

World sought to have the First Arbitration panel consider Del
Prete's report.  Defs.' Countercls. ¶ 148; Pl.'s Ans. ¶ 148.

If the Penn entities believe that they found some
vindication before the First Arbitration panel, Pirito, too,
alleges that he was vindicated.  According to Pirito, on February
1, 2008, "[t]he Arbitration Panel rejected Defendant Penn World's
position" that "it had a right to demand that Plaintiff pay an
additional €3,000,000 / $4,094,760 USD to Defendant before
conveying title to the Real Property as a 'guarantee' that other
allegedly outstanding amounts owed by Plaintiff would be paid."
Pl.'s Compl. ¶ 39.  Pirito further contends that "[t]he first
Arbitration Panel refused to consider Mr. Del Prete's findings
because it concluded that the issue of price adjustment could not
be adjudicated as an arbitration matter."  Pl.'s Ans. ¶ 149.  The
Penn entities disagree, maintaining that the Panel "did not
consider Dr. Del Prete's findings" merely due to "Pirito delaying
the appointment of Dr. Del Prete and delaying and hindering the
completion of his report."  Defs.' Countercls. ¶ 149.  Penn World
thus filed a second request for arbitration (the "Second
Arbitration") before the Chamber on March 20, 2008.  Penn World's
Pet. to Confirm Arb. Award ("Def.'s Pet.") ¶ 11; Pl.'s Resp. to
Def.'s Pet. ¶ 12.

### D.   __The Undisputed Facts As To The Second Arbitration__

On February 13, 2009 -- shortly before the parties filed their pleadings in this action -- the Chamber filed a Partial Award on Jurisdiction in the Second Arbitration.  Defs.' Pet. at 4 n.1; Pl.'s Resp. to Def.'s Pet. ¶ 13.  In the Partial Award, a majority of the arbitral panel concluded that "[t]he Tribunal has jurisdiction on the claim of the Claimant for the Net Worth Deficit as formulated in the Request for Arbitration." Ex. C to Def.'s Pet. at 25.  One arbitrator dissented, explaining that "the First Tribunal held that it lacked jurisdiction on __all__ claims relating to price reduction pursuant to Article 2(d) SPA," __id.__ at 8[1] (emphasis in original), and that "[t]he First Tribunal's decision on jurisdiction -- and more specifically on the interpretation of the Arbitration Clause in relation to the issue of price reduction -- is final, it is __res judicata__." __Id.__ at 9.  The dissenting arbitrator thus concluded that "the finding of the majority that our Tribunal has jurisdiction over the Claim

---

[1] Though Penn World presents the majority and dissenting opinions in the Second Arbitration Panel's Partial Award in a single exhibit, the opinions have been separately paginated.  Thus, a pagination reference to the exhibit may denote either of two different pages.  Where we refer to the dissenting opinion, we use its separate pagination; these numbers do __not__ refer to the majority opinion.

is . . . in contrast with the decision on jurisdiction of the

First Tribunal which is final and binding," and that "[o]ur

Tribunal should therefore have declined jurisdiction over the

Claim."  Id. at 11.

On September 18, 2009 -- after Pirito had filed his

complaint and the Penn entities had filed their counterclaims,

but before Pirito answered these counterclaims -- the Second

Arbitration panel issued a Final Award.  Def.'s Pet. ¶ 14; Pl.'s

Resp. to Def.'s Pet. ¶ 14.  The panel noted that Penn World had

submitted three prayers for relief, Ex. B to Def.'s Pet. ¶ 52

(quoting Penn World's Ex. C-5 at 13):

> "1.   Condemn the Respondent to pay the amount
>       of € 1,485.677, deriving from the
>       determination of Mr Del Prete, with
>       interest from the 5th February 2003 to
>       the moment of payment at the applicable
>       Rate (Euribor at one month) . . . .
>
> 2.    Condemn the RESPONDENT to pay the amount
>       of € 40,935.66 for the 50% of the costs
>       of Mr Del Prete (plus interest from the
>       date of the invoice of Mr Del Prete) and
>       € 150,000 -- for legal costs for the
>       proceedings in volontaria girisdizione;
>
> 3.    Condemn the RESPONDENT to pay all the
>       costs of these proceeding [sic]."

The Second Arbitration Panel concluded that "[t]he conclusions of the Del Prete Report are valid, final and binding upon the Parties," id. ¶ 116, and thus decided as follows, id. at 32:

>       1.    Mr Cataldo Pirito shall pay to
>             Pennengineering World Holdings LP the
>             amount of € 1.485,677 plus interest at
>             the Euro Libor (one month) as reported
>             in the Wall Street Journal as from 5
>             February 2003 until full and complete
>             payment;
>
>       2.    Mr Cataldo Pirito shall pay to
>             Pennengineering World Holdings LP the
>             amount of € 40,935.66 as participation
>             to Mr Del Prete costs and fees, plus
>             interest at the legal rate as from 9
>             January 2008 until full and complete
>             payment;
>
>       3.    Mr Cataldo Pirito shall pay to
>             Pennengineering World Holdings LP the
>             amounts of:
>
>             (i)    € 50,000 as compensation for
>                    costs and fees incurred in
>                    connection with the procedure
>                    of Volontaria Giurisdizione;
>
>             (ii)   € 60,000 as compensation for
>                    costs and fees incurred in
>                    connection with the
>                    arbitration proceedings;
>
>             (iii)  € 105,269.31 as participation to the
>                    arbitration costs.
>
>       4.    Any and all other claims by the Parties
>             are dismissed.

Pirito states that he

> has appealed the Partial Award on
> Jurisdiction and Final Award II
> (collectively, the 'Appeal'), which are
> currently pending.  A hearing with respect to
> the Appeal is currently scheduled for
> September 18, 2012; however, Pirito is
> attempting to expedite the matter.

Pl.'s Resp. to Def.'s Pet. ¶ 15.  The Penn entities concede that

Pirito has lodged this appeal, <u>see</u>, <u>e.g.</u>, Defs.' Br. in Supp. of

Mot. for Summ. J. ("Defs.' MSJ Br.") at 13 n.9 ("Pirito appealed

the finding of jurisdiction to the Milan Court of Appeal."),

though they ironically note that "[i]f Pirito has made any

arrangement to expedite the appeal, he has not shared that fact

with Penn World's counsel of record in Italy."  Def.'s Reply in

Supp. of Def.'s Pet. at 6.


## II.  <u>Analysis</u>

Rather than address the pending motions in the order

they were filed, we will consider them in a more logical

sequence: (1) Pirito's motion to dismiss for lack of

jurisdiction; (2) Penn World's petition to confirm arbitration

award; (3) the Penn entities' motion for summary judgment; and

(4) the Penn entities' motion for costs.

### A. <u>Pirito's Motion to Dismiss for Lack of Jurisdiction</u>

Pirito notes that the Agreement between him and Penn World "includes an arbitration clause, making all disputes concerning the 'validity, interpretation, performance and termination' of the SPA subject to arbitration," Pl.'s Mot. to Dismiss at 2 ("Pl.'s MTD") (quoting Agreement § 13(m)), though he concedes that Penn Engineering's Guarantee "does not contain an arbitration provision." <u>Id.</u> at 3 (citing Guarantee). Pirito further observes that he "filed his Answer to the Counterclaims on September 28, 2009, wherein he asserted several affirmative defenses, including that 'Counts I-IV are improper in this forum and should be dismissed since Counts I-IV are subject to the arbitration provisions of Section 13(m) contained in the Share Purchase Agreement.'" <u>Id.</u> at 6 (quoting Pl.'s Ans. at 19). He thus contends that "[t]he Court should dismiss the Counterclaims because: (i) the Counterclaims asserted by Defendants are subject to arbitration pursuant to Section 13(m) of the SPA to which the parties expressly agreed; and (ii) Pirito has not waived his right to enforce the arbitration clause." <u>Id.</u> at 7.

Penn Engineering responds that although the Agreement included an arbitration clause, "Penn Engineering was not a party to that Agreement." Penn Eng'g's Resp. to Pl.'s MTD at 1

18

(emphasis omitted).  Since "[t]he Guarantee does not include an arbitration agreement, and indeed, Pirito's Motion makes no claim that there is any arbitration agreement with Penn Engineering," Penn Engineering urges that "Pirito's Motion should be summarily denied as to Penn Engineering."  Id. at 2.

As for Penn World, it explains that "Pirito's motion ignores one key, and dispositive fact: Pirito has himself brought a breach of contract claim against Penn World that is squarely within the scope of the Agreement's arbitration clause."  Penn World's Resp. to Pl.'s MTD at 18.  Penn World further suggests that granting Pirito's motion "would result in prejudice, duplication, multiple trials of the same issues and potentially divergent rulings."  Id. at 19.  As a result, Penn World argues that "Pirito has waived his arbitration rights under the Agreement," and that his motion should be denied.  Id. at 27.

Pirito suggests that "'[w]here parties have agreed to submit claims to arbitration under a valid and enforceable arbitration clause or agreement, dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) is proper.'"  Pl.'s Mot. at 7 (quoting Allstate Ins. Co. v. Masco Corp., 2008 WL 183651, at *2 (E.D. Pa. 2008)).  But our Court of Appeals has explained that the issue of whether a defendant "has or does not have a

19

contract-based defense requiring arbitration rather than litigation . . . . is not a jurisdictional one." <u>Lloyd v. HOVENSA, LLC</u>, 369 F.3d 263, 272 (3d Cir. 2004).  We will consequently evaluate Pirito's motion pursuant to Fed. R. Civ. P. 12(b)(6), not Rule 12(b)(1).

In evaluating a Rule 12(b)(6) motion to dismiss, we "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom," <u>Ordonez v. Yost</u>, 289 Fed. Appx. 553, 554 (3d Cir. 2008) (internal quotation marks omitted), and "consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." <u>Brown v. Daniels</u>, 128 Fed. Appx. 910, 913 (3d Cir. 2005) (internal quotation marks omitted).  When, as here, a Rule 12(b)(6) motion to dismiss is premised on an affirmative defense appearing on the face of a plaintiff's pleading, "[t]he question to be answered . . . becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis" for rejecting the affirmative defense.  <u>Leone v. Aetna Cas. & Sur. Co.</u>, 599 F.2d 566, 567 (3d Cir. 1979) (discussing a motion to dismiss based on noncompliance with the applicable limitations

period).  However, the Supreme Court has also reminded courts
that affirmative defenses are "subject to rules of forfeiture and
waiver."  John R. Sand & Gravel Co. v. United States, 552 U.S.
130, 133 (2008).  We will thus consider the allegations in the
pleadings and the documents attached thereto, as well as the
litigation conduct of the parties, to determine whether (1) the
affirmative defense of arbitrability may apply to the Penn
entities' counterclaims; and, if so, (2) this defense is
nonetheless subject to waiver or forfeiture.

Our Court of Appeals has noted that "a question of
arbitrability arises only in two circumstances -- first, when
there is a threshold dispute over whether the parties have a
valid arbitration agreement at all, and, second, when the parties
are in dispute as to whether a concededly binding arbitration
clause applies to a certain type of controversy."  Puleo v. Chase
Bank USA, N.A., 605 F.3d 172, 178 (3d Cir. 2010).  With respect
to Penn Engineering's counterclaims, Pirito's motion to dismiss
fails to satisfy Puleo's threshold inquiry.  Penn Engineering was
not a party to the Agreement (which contained an arbitration
clause), its Guarantee contained no arbitration clause, and
Pirito has identified no other agreement that might impose upon

Penn Engineering an obligation to arbitrate its claims.  We will thus deny Pirito's motion as to Penn Engineering's counterclaims.

Penn World, on the other hand, contends that "Pirito's Motion ignores the fact that Pirito's claim against Penn World . . . is every bit as subject to arbitration as the Counterclaims." Penn World's Resp. to Pl.'s MTD at 21-22.  Penn World thus appears to concede that its claims are subject to arbitration. We will consequently proceed to the second question we identified above: whether Pirito's affirmative defense is subject to waiver.

Our Court of Appeals has stressed that "prejudice is the touchstone for determining whether the right to arbitrate has been waived," Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 925 (3d Cir. 1992), and has set forth six factors that may guide the waiver determination.  Id. at 926-27.  A fair reading of Hoxworth suggests, however, that its test was intended for situations where a party might have waived the right to arbitrate due to its acquiescence with the opposing party's litigation conduct, not for the exceptional case in which the party asserting the defense of arbitrability itself initiated the litigation by asserting arbitrable claims.  We have found only one case from this Circuit in which a party attempted to employ such a gambit.  See Expofrut S.A. v. M/V Aconcagua, 280 F. Supp.

2d 374 (E.D. Pa. 2003) (Rufe, J.) (denying plaintiff's motion to stay proceedings pending arbitration).

Moreover, our Court of Appeals has emphasized that "[a]s is evident by our repeated characterization of [the Hoxworth] factors as a nonexclusive list, not all the factors need be present to justify a finding of waiver, and the waiver determination must be based on the circumstances and context of the particular case." Nino v. Jewelry Exch., Inc., 609 F.3d 191, 209 (3d Cir. 2010) (internal quotation marks and brackets omitted). Thus, "the investment of considerable time and money litigating a case may amount to sufficient prejudice to bar a later-asserted right to arbitrate," since to conclude otherwise might frustrate "the purpose behind arbitration itself -- arbitration is meant to streamline the proceedings, lower costs, and conserve private and judicial resources." Id. Given the nonexclusive nature of the Hoxworth factors, the unique circumstances of this case, and Nino's admonition that prejudice and the purposes of arbitration should guide the waiver inquiry, we will thus dispense with a factor-by-factor examination of Pirito's entitlement to assert the arbitrability defense and focus on whether such an assertion would prejudice the Penn

entities, complicate judicial proceedings, squander resources,
and cause delay.

We find that it would.  We first note that Pirito's
breach of contract claim against Penn World plainly falls within
the Agreement's arbitration clause since it concerns the
"validity, interpretation, performance and termination" of
"provisions of this Agreement" and does not concern "the
preparation of the Closing Statement and any reduction of the
Purchase Price under Section 2(d)."  Agreement § 13(m).  Thus,
Pirito has waived the defense of arbitrability not by passive
acquiescence -- as we more commonly see and as Hoxworth envisions
-- but by his active choice of this forum.  By submitting his
arbitrable claim to this Court, he has waived the argument that
this Court is an inappropriate forum for the resolution of such
claims.  In this context, the fact that Pirito did assert the
affirmative defense of arbitrability in his answer to the Penn
entities' counterclaims, see Pl.'s Ans. at 19, diminishes in
importance.

Second, Penn World rightly explains that if we grant
Pirito's motion, the parties will be forced to litigate
intimately related claims before different tribunals, since
neither Pirito's claim against Penn Engineering nor Penn

24

Engineering's counterclaims against Pirito are subject to arbitration.  Penn World's Resp. to Pl.'s MTD at 25-26.  Such an approach will not only waste the resources of the parties and the tribunals, it will raise the specter of inconsistent adjudications of the parties' rights and obligations.

Finally, Penn World notes that its "domestic counsel has spent considerable time on this matter since Plaintiff filed his Complaint in May 2009, and actively participated in two unsuccessful mediation sessions aimed at resolving the parties' numerous disputes." Id. at 26.  We have similarly expended significant judicial resources in familiarizing ourselves with this complex litigation -- to say nothing of the labor of Hercules Judge Hart undertook for so long -- and we note that the parties have already filed and fully briefed three motions (aside from Pirito's motion to dismiss) in this action.

Under these circumstances -- where Pirito has waived any argument that arbitrable claims should not be litigated in this forum -- granting Pirito's motion would cause significant judicial inefficiency and risk inconsistent outcomes.  The parties and the Court have already devoted much ink, effort and time to these proceedings.  It therefore simply makes no sense to dismiss Penn World's counterclaims in favor of arbitration.  This

is especially true given that the purpose of arbitration is to streamline litigation and reduce costs.  We will consequently deny Pirito's motion to dismiss Penn World's counterclaims.

### B.  <u>Penn World's Petition to Confirm Arbitration Award</u>

In Penn World's petition, it asked that the Court "confirm and enter judgment upon the Arbitration Final Award entered on September 18, 2009 by the Chamber of National and International Arbitration of Milan, in Milan, Italy in Arbitration No. 2308." Def.'s Pet. at 1.  Penn World sought "an order confirming the Final Award, for entry of judgment in the amount (as of April 30, 2011) of $1,419,704, plus post judgment interest at the Euro Libor (1 month) rate, and for costs and such other relief as the Court may deem proper." <u>Id.</u> at 7.  Penn World's proposed Order also noted that "this judgment fully resolves Count III of the Counterclaim." <u>Id.</u> at 8.

Pirito initially filed a response in opposition to this motion, <u>see</u> Pl.'s Resp. to Def.'s Pet., and then, by letter, "advise[d] the Court that Mr. Pirito wishes to withdraw his opposition to the Motion and consents to the entry of judgment in the form attached hereto." Pl.'s June 30, 2011 Letter at 1.  As we noted in our July 21, 2011 Order, "the parties appear to agree

that the Court should confirm the Chamber of National and International Arbitration of Milan's September 18, 2009 award in Arbitration No. 2308 in the amount of $1,391,886 with post-judgment interest at a rate of Euro Libor (1 month)."  Order ¶ (g), July 21, 2011.  However, the parties' proposed judgments suggested that they disagreed "as to whether this judgment should (1) resolve Count III of Penn World's counterclaims; (2) explicitly reserve Pirito's rights before the Milan Court of Appeals and his other rights under the Federal Rules of Civil Procedure; or (3) be characterized as 'final.'"  Id. ¶ (h).

We explained that it was unnecessary in any judgment to make a pronouncement as to Pirito's future rights, id. ¶¶ (m)-(n), and that Penn World had not explained why confirming the Chamber's September 18, 2009 Award "resolved" Count III of the Penn entities' counterclaims.  Id. ¶¶ (i)-(l).  We also noted that the parties had not briefed us on the propriety of certifying any judgment as final pursuant to Fed. R. Civ. P. 54(b).  Id. ¶¶ (o)-(s).  We thus instructed Penn World "to show cause why we should issue a Rule 54(b) certification as to any judgment confirming the September 18, 2009 arbitration award" and gave Pirito leave to brief us on the same topic.  Id. at ¶ 8.

Penn World and Pirito have now filed briefings responsive to our July 21, 2011 Order.  Penn World suggests that "confirmation of the award is the ultimate disposition of a cognizable claim for relief," Penn World's Br. at 4, Aug. 3, 2011, and that "there is no just reason to delay making [the Award] final, thereby permitting enforcement."  Id. at 6.  Penn World further explains that "resolution of the Petition to Confirm does moot Count III; thus, it does not remain an alternate theory of recovery."  Id. at 4.  Pirito responds that "[t]he Judgment is not 'final' for Rule 54(b) purposes because the Appeal of Final Award II may require modification or vacation of the Judgment and it does not resolve an individual claim," since "Final Award II is inextricably intertwined with all of the Counterclaims."  Pl.'s Br. at 1-2, Aug. 3, 2011.

In ruling on Penn World's petition, we must determine: (1) what it means to confirm the Chamber's September 18, 2009 Award; (2) whether such confirmation "resolves" Count III of the Penn entities' counterclaims, and, if so, in what manner; and (3) whether any judgment confirming the award should be certified as final.

We begin by returning to first principles.  9 U.S.C. § 201 provides that "[t]he Convention on the Recognition and

28

Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter."  Under § 203, "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."

Finally, § 207 states that

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.  The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

Article V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"[2]) lists seven grounds upon which "[r]ecognition and enforcement of the award may be refused," New York Convention

---

[2] As Judge Haight has observed, "[b]ecause the Convention was drafted in New York under United Nations sponsorship, it is sometimes referred to in the literature as the 'New York Convention.'" Spier v. Calzaturificio Technica S.p.A., 663 F. Supp. 871, 872 n.1 (S.D.N.Y. 1987).

art. V, none of which the parties have suggested apply here.

Article VI provides that

> If an application for the setting aside or
> suspension of the award has been made to a
> competent authority referred to in article
> V(1)(e), the authority before which the award
> is sought to be relief upon may, if it
> considers it proper, adjourn the decision on
> the enforcement of the award and may also, on
> the application of the party claiming
> enforcement of the award, order the other
> party to give suitable security.

Though Pirito initially suggested that Article VI should rule

Penn World's petition, he has now withdrawn his opposition to the

petition.  We thus have the authority to confirm the Award

pursuant to 9 U.S.C. § 207, and neither party suggests that we

should refuse "[r]ecognition and enforcement of the award," New

York Convention art. V, or "adjourn the decision on the

enforcement of the award."  Id. art. VI.

We thus turn to the question of what it means to

confirm the September 18, 2009 Award.  As we have already

explained, Penn World submitted three prayers for relief to the

Second Arbitration panel, seeking "'€ 1,485.677, deriving from

the determination of Mr Del Prete,'" "'€ 40,935.66 for the 50% of

the costs of Mr Del Prete,'" "'€ 150,000 -- for legal costs for

the proceedings in volontaria girisdizione," and "'all the costs

of these proceeding [sic].'" Ex. B to Def.'s Pet. ¶ 52 (quoting

Penn World's Ex. C-5 at 13).  Penn World did not seek a

declaratory judgment from the Panel that Del Prete's report was

valid, final, or binding upon the parties.  The Panel decided

that Pirito would pay Penn World a total of €1,741,882 plus

interest,[3] representing nearly all of the amounts Penn World

requested.  Id. at 32.  En route, the Panel concluded that "[t]he

conclusions of the Del Prete Report are valid, final and binding

upon the Parties." Id. ¶ 116.  This conclusion was not part of

its decision, however.[4]  In confirming the Award, then, we would

confirm only Pirito's obligation to pay Penn World the sums that

the Panel described in its decision; such confirmation would not

constitute judicial affirmation that the Del Prete Report was

"valid, final, and binding upon the Parties."  Id.

---

[3] As Penn World explains, this amount differs from what
it seeks in its petition to confirm the arbitration award because
"the Final Award totaled €2,057,208 before Penn World executed on
the €1,069,283.34 in the escrow.  After execution, €987,924
($1,391,886 as converted on 5/24/11) remains to be collected."
Penn World's Br. at Appx. I at 2, Aug. 3, 2011 (citations
omitted).

[4] Whether the Second Arbitration panel's determination
as to Del Prete's report is issue preclusive is a question we
take up below when we consider the Penn entities' motion for
partial summary judgment.  See Section II.C, infra.

31

We turn next to the effect of confirmation upon Count III of the Penn entities' counterclaims.  Penn World argues that "Count III sought and the Final Award determined that Dr. Del Prete's determination of the Net Worth Deficit (€1,485,677 plus interest, costs and fees) should be enforced," Penn World's Br. at 5, Aug. 3, 2011, so that "resolution of the Petition to Confirm <u>does</u> moot Count III."  <u>Id.</u> at 4 (emphasis in original). We observe that Penn World does <u>not</u> suggest that confirmation of the petition means that we have <u>granted</u> judgment in favor of Penn World on Count III,[5] as indeed it could not.  Count III seeks "Enforcement of the Determination of Independent Public Accountant," and, as we have noted, confirming the September 18, 2009 Award does not mean that we have confirmed the findings of Del Prete's report.  Instead, Penn World explains that confirming the Award grants it the relief it seeks under Count III, making that claim moot.  We thus conclude that confirming the September 18, 2009 Award would permit us to dismiss Count III as moot.

We now arrive at our final question: whether any judgment confirming the September 18, 2009 Award should be certified as final pursuant to Rule 54(b), which provides that

---

[5] As we explain below, Penn World does seek this relief in its motion for summary judgment.  <u>See</u> Section II.C, <u>infra</u>.

> When an action presents more than one claim
> for relief -- whether as a claim,
> counterclaim, crossclaim, or third-party
> claim -- or when multiple parties are
> involved, the court may direct entry of a
> final judgment as to one or more, but fewer
> than all, claims or parties only if the court
> expressly determines that there is no just
> reason for delay.

Our Court of Appeals has explained that "in setting the standards

for a certification under Fed. R. Civ. P. 54(b), we have

indicated that the court must determine whether there are

multiple claims or merely alternative legal theories supporting a

single claim." Am. Motorists Ins. Co. v. Levolor Lorentzen,

Inc., 879 F.2d 1165, 1171 (3d Cir. 1989) (internal quotation

marks omitted). Thus, "if a plaintiff presents a number of

alternative legal theories to support a single recovery there is

only one claim and there can be no certification." Id.

Penn World argues that "almost all petitions to confirm

awards are filed as separate stand alone cases because, as here,

they present only the issue of whether the award should be

confirmed and enforced." Penn World's Br. at 4, Aug. 3, 2011.

Penn World further asserts that "Count III of the counterclaims

is the only claim for recovery of the Net Worth Deficit." Id.

(capitalization omitted). While we agree with Penn World's first

proposition -- that petitions to confirm arbitration awards can

be stand-alone claims -- we disagree with its second proposition,
that its petition here constitutes an independent claim.

According to the Penn entities, "[i]n § 2(d) of the
Agreement, Pirito represented and guaranteed on January 23, 2003
and February 5, 2003 that the minimum net worth would be not less
than €815,821." Defs.' Countercls. ¶ 23. The Penn entities thus
contend that "[b]ased on the report of Dr. Del Prete, dated
October 12, 2007, there is a gaping differential of €1,485,687
between the actual net worth on February 5, 2003 and the Minimum
Required Net Worth as represented by Pirito and set forth in
detail in the Agreement and Financial Statements." Id. ¶ 49.
Count IV of the Penn entities' counterclaims alleges that "[a]s
set forth in detail above, Pirito has breached of [sic] the
Agreement, including but limited to Section[] 2 . . . . Pirito's
breaches have caused millions of Euros in damages to Penn World,"
id. ¶¶ 194-95, so that "Penn World demands that judgment be
entered against Pirito for all damages suffered by Penn World."
Id. at 48. These allegations demonstrate that Penn World seeks
damages under its breach of contract claim for Pirito's alleged
misrepresentations in § 2(d) of the Agreement of the net worth
deficit. This conclusion is bolstered by the Penn entities'
argument, in their motion for partial summary judgment, that

"[t]he Del Prete Report and the Final Award establish that
Pirito's promises and representations as to the Net Worth were
false. . . . They also will establish that Pirito breached the
Agreement by breaching the net worth representation and
guarantee."  Defs.' MSJ Br. at 20.

Since Penn World concedes that Count III of the
counterclaims and its petition to confirm arbitration award both
seek "recovery of the net worth deficit," Penn World's Br. at 4,
Aug. 3, 2011, it is apparent that the petition and Count IV
present alternative theories -- on the one hand, confirmation of
an arbitration award, and, on the other, breach of contract -- in
support of a claim for recovery of the net worth deficit.  As a
consequence, Penn World's proposed judgment confirming the
September 18, 2009 Award fails to satisfy the threshold inquiry
under Rule 54(b) since it does not resolve "one or more" claims,
but rather resolves one theory in support of its claim for
payment of the net worth deficit.

We thus do not reach the question of whether there is
just reason to delay enforcing the judgment, and we cannot
certify such a judgment as final.  We will accordingly grant Penn
World's petition to confirm arbitration award as unopposed and
dismiss Count III of the Penn entities' counterclaims as moot,

but will decline to certify our Judgment in favor of Penn World
as final.[6]

### C.   The Penn Entities' Motion for Partial Summary Judgment

The Penn entities move for "I) partial summary
judgment; II) determination that certain facts found in the Del
Prete Report and Final Award are taken as established in this
Action; and III) in limine." Defs.' Mot. for Summ. J. ("Defs.'
MSJ") at 1.   In support thereof, the Penn entities argue that

> Plaintiff Cataldo Pirito . . . is
> contractually bound to accept as final the
> findings and conclusions of the Del Prete
> Report and the Final Arbitration Award in
> this litigation.  Moreover, the standards for
> recognition of a foreign judgment, including
> arbitration awards, delineated in Hilton v.
> Guyot, 159 U.S. 113, 163-64, 205 (1895) . . .
> and the doctrine of issue preclusion prohibit
> Pirito from relitigating the facts found in
> the Del Prete Report and confirmed by the
> Final Award.

Defs.' MSJ Br. at 1-2.  Pirito responds that "under Pennsylvania

---

[6] We apply the exchange rate as published in today's
Wall Street Journal (one € = $1.3047).  Given that the Penn
entities therefore cannot immediately enforce this Judgment
against Pirito, we will entertain briefing from the parties on
whether we should (and may) order Pirito to post security for
this Judgment.

law,[7] Final Award II is not a final judgment since it is subject to the pending Appeal," and that "because Pirito challenged the Arbitral Tribunal's jurisdiction, neither the Hilton standards nor principles of comity require this Court to enter summary judgment."  Pl.'s Resp. to Defs.' MSJ at 10.

As the Penn entities correctly observe, Fed. R. Civ. P. 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought."  The Penn entities thus seek summary judgment not only as to Count III of their counterclaims -- a request rendered moot by our decision in Section II.B, supra -- but also as to "the element of material misrepresentation in Count I of the Counterclaim and Defendants' Fifth and Eighth Affirmative Defenses; and the element of breach of the contract in the Counterclaims and in Defendants' Fourth, Eighth, and Eleventh Affirmative Defenses."  Defs.' MSJ ¶ 2.

---

[7] The parties agree that the Pennsylvania law of issue preclusion should apply here.  See Pl.'s Resp. to Defs.' MSJ at 11 n.3 ("Pirito agrees with Defendants that Pennsylvania law applies to the Court's determination of whether Final Award II should have preclusive effect."); Defs.' MSJ Reply 3 n.5 ("Plaintiff and Penn are in agreement that Pennsylvania law governs this collateral estoppel issue.").

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." Bello v. Romeo, 424 Fed. Appx. 130, 133 (3d Cir. 2011). In evaluating a Rule 56 motion, we of course "'must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence.'" Eisenberry v. Shaw Bros., 421 Fed. Appx. 239, 241 (3d Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

The Penn entities first argue that the Agreement "mandates that disputed matters related to the net worth be resolved by an independent public accountant, 'and the determination of such accountant shall be binding on the parties hereto.'" Defs.' MSJ Br. at 19 (quoting Agreement § 2(d)). Pirito does not appear to respond to this argument, but examination of the language of the Agreement suggests that we should nonetheless reject it. Section 2(d) of the Agreement provides that

> If the Buyer and the Seller are unable to
> resolve such dispute within 15 days after the
> Buyer is notified thereof, the disputed
> matters shall be referred to an independent
> public accountant satisfactory to the Buyer
> and the Seller, who shall be directed to
> determine the Net Worth of the Company as of
> the close of business on the business day
> immediately preceding the Closing Date and
> the determination of such accountant shall be
> binding on the parties hereto.  If the Buyer
> and the Seller are unable to agree upon an
> independent public accountant, the Buyer and
> the Seller shall each designate an
> independent public accountant, who shall
> choose the independent public accountant that
> will finally determine the Net Worth of the
> Company as of the close of business on the
> business day immediately preceding the
> Closing Date.

As this language makes clear, the phrase "such accountant" --
describing one whose determination binds the parties -- refers to
"an independent public accountant satisfactory to the Buyer and
the Seller."  Id.  Since the Penn entities have pointed to no
evidence suggesting that Del Prete was "satisfactory" to Pirito,
we cannot conclude that the plain language of the Agreement makes
Del Prete's determination binding upon Pirito.[8]

---

[8] Our decision in this respect does not, however,
foreclose the possibility that (1) the alternative mechanism for
determining the net worth envisioned in Agreement § 2(d) -- "the
Buyer and the Seller shall each designate an independent public
accountant, who shall choose the independent public accountant
that will finally determine the Net Worth of the Company" --
(continued...)

The Penn entities' second argument is that "[f]ederal courts permit 'the use of a foreign judgment [and arbitration awards] to estop relitigation of an issue if the judgment satisfies (1) the Hilton requirements for recognition of a foreign judgment, and (2) the requirements of collateral estoppel." Defs.' MSJ Br. at 21-22 (quoting Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 33 (D.D.C. 2007)) (brackets in Defs.' MSJ Br.). Because "the Final Award satisfies the Hilton Standards," id. at 26, the Penn entities suggest that "[t]his Court should not permit Pirito's continued attempt to evade . . . the valid judgment of the arbitrators in the Final Award." Id. at 28.

Pirito responds that "Plaintiff is challenging the jurisdiction of the Arbitral Tribunal in the Appeal," and that "[t]herefore, the principles of comity do not require that this Court find that the Del Prete Report and Final Award II are binding." Pl.'s Resp. to Defs.' MSJ at 14. Pirito also explains

---

[8] (...continued)
might produce a binding determination; or (2) refusal by one party to participate in the mechanism established by § 2(d) might justify recourse to use another mechanism for arriving at a binding determination of the net worth. The Penn entities have not briefed us on either of these possibilities.

that "Final Award II is not . . . a final judgment on the merits

and cannot have preclusive effect." Id. at 12.

> In Hilton, the Supreme Court held that

>> When an action is brought in a court of this
>> country, by a citizen of a foreign country
>> against one of our own citizens, to recover a
>> sum of money adjudged by a court of that
>> country to be due from the defendant to the
>> plaintiff, and the foreign judgment appears
>> to have been rendered by a competent court,
>> having jurisdiction of the cause and of the
>> parties, and upon due allegations and proofs,
>> and opportunity to defend against them, and
>> its proceedings are according to the course
>> of a civilized jurisprudence, and are stated
>> in a clear and formal record, the judgment is
>> prima facie evidence, at least, of the truth
>> of the matter adjudged; and it should be held
>> conclusive upon the merits tried in the
>> foreign court, unless some special ground is
>> shown for impeaching the judgment, as by
>> showing that it was affected by fraud or
>> prejudice, or that by the principles of
>> international law, and by the comity of our
>> own country, it should not be given full
>> credit and effect.

159 U.S. at 159-60.  On the basis of this test -- and Hurst's

suggestion that a foreign judgment may have issue preclusive

effect if it satisfies the requirements for collateral estoppel,

474 F. Supp. 2d at 33 -- we note three problems with the Penn

entities' suggestion that because of Hilton and the doctrine of

collateral estoppel the September 18, 2009 Award estops Pirito

from re-litigating issues the Second Panel decided.  While two of

41

these problems are not necessarily insuperable, the third bars us from granting the Penn entities' motion.

First, as Pirito notes, he has challenged -- and indeed is currently challenging -- the Second Arbitration panel's jurisdiction over Penn World's claims.  Though the Penn entities suggest that "Pirito's arguments have been considered, repeatedly, and rejected, repeatedly," Defs.' MSJ Br. at 28, we note that one arbitrator supplied a well-reasoned dissent to the Second Arbitration Panel's February 13, 2009 Partial Award on Jurisdiction.  While we (of course) express no view as to the correctness of this dissent, our examination of it reveals that Pirito's jurisdictional objections are, at the very least, not frivolous. The parties have not fully briefed us on whether the Second Arbitration panel had jurisdiction over Penn World's claims, and, even if they had, we doubt whether it would be wise[9] to make a jurisdictional determination of our own on this

---

[9]    The interests of comity that the Penn entities espouse suggest that we should defer to the Italian court where Pirito is prosecuting his appeal of the Second Arbitration panel's jurisdiction rather than arrive at an independent determination -- possibly subject to later contradiction by that court -- in order to apply the <u>Hilton</u> test.  However, the parties have not briefed us on this question.

question.  At a minimum, we lack confidence that the

jurisdictional prong of the Hilton test has been satisfied here.

Second, the Penn entities add "[and arbitration

awards]" to the language of Hurst but present no case law

supporting this amendment, and indeed concede that neither "the

Third Circuit [nor] Pennsylvania . . . . has expressly addressed

how these two doctrines should apply to a foreign arbitration

award governed by the New York Convention." Id. at 22 n.11.  Our

examination of Hilton reveals that it limits its application to a

judgment rendered by a "court of that country," not a private

tribunal that happens to convene in another country.  This

limitation is made explicit by Hilton's description of the

grounds on which it rests, i.e. comity:

> 'Comity,' in the legal sense, is neither a
> matter of absolute obligation, on the one
> hand, nor of mere courtesy and good will,
> upon the other.  But it is the recognition
> which one nation allows within its territory
> to the legislative, executive, or judicial
> acts of another nation, having due regard
> both to international duty and convenience,
> and to the rights of its own citizens, or of
> other persons who are under the protection of
> its laws.

Hilton, 159 U.S. at 143 (emphasis added).  Hilton thus makes

clear that comity is grounded in mutual respect between

sovereigns for their official acts.  The Penn entities have not

explained why considerations of comity require a <u>national</u> <u>court</u> of this country to accord similar respect to the decisions of a <u>private tribunal</u> in another country.[10]  As a result, we are not convinced that <u>Hilton</u> obliges us to accord issue preclusive effect to the decisions of foreign arbitral tribunals.

To be sure, these are not mere questions of good international etiquette.  The Supreme Court has stressed that they are founded on "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' [international arbitration] agreement." <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 629 (1985). Our Court of Appeals has also held that "[u]nder Pennsylvania law, arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel," <u>Witkowski v. Welch</u>, 173 F.3d 192, 199 (3d

---

[10] Of course, 9 U.S.C. § 207 requires courts to confirm foreign arbitral awards "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said [New York] Convention."  <u>See also</u> Section II.B, <u>supra</u>.  But the fact that this statute, implementing an international treaty, imposes this obligation does not necessarily mean that <u>comity</u> does so as well.

44

Cir. 1999).   Judge Buchwald has noted that "in the Second
Circuit, the doctrine of collateral estoppel has long been
applied to arbitrator's decisions, and the effects of foreign
arbitration are no less preclusive than domestic arbitration."
Alghanim v. Alghanim, 2011 WL 5978350, at *24 (S.D.N.Y. 2011)
(citations omitted).   We thus do not reject the possibility that
comity or some other doctrine may oblige us to estop re-
litigation of an issue a foreign arbitral tribunal decides,
provided that tribunal had jurisdiction and the elements of
collateral estoppel have been satisfied.   The possibility that
such estoppel could apply here, however, does not mean the
September 18, 2009 Award fails to satisfy the collateral estoppel
elements.

This brings us to the third problem with the Penn
entities' arguments.   As our Court of Appeals has rehearsed,

> Collateral estoppel, also known as issue
> preclusion, prevents relitigation of a
> particular fact or legal issue that was
> litigated in an earlier action.   In order for
> the doctrine to apply, (1) the issue decided
> in the prior adjudication must be identical
> to the one presented in the later action, (2)
> there must be a final judgment on the merits
> and (3) the party against whom the doctrine
> is asserted must have been a party or in
> privity with a party to the prior
> adjudication and have had a full and fair

> opportunity to litigate the issue in question
> in the prior action.

Seborowski v. Pittsburgh Press Co., 188 F.3d 163, 169 (3d Cir.

1999).

Pirito points out that in Pennsylvania "there are two

lines of cases that address whether a judgment subject to appeal

is 'final' for claim preclusion purposes," Pl.'s Resp. to Defs.'

MSJ at 12.  One of these series of cases holds that a judgment is

not final for collateral estoppel purposes while an appeal from

that judgment is pending.  The other maintains that a state court

judgment is final for these purposes until it has been reversed.

Id.  According to Pirito, our Court of Appeals has concluded that

in light of this split, a "'District Court should stay its

determination until the issue is resolved upon appeal.'"  Id.

(quoting Ashford v. Skiles, 837 F. Supp. 108, 115 (E.D. Pa. 1993)

(Brody, J.) (citing Bailey v. Ness, 733 F.2d 279, 283 (3d Cir.

1984)).  The Penn entities reply that in Shaffer v. Smith, 673

A.2d 872, 876 (Pa. 1996), "the Supreme Court resolved the 'split'

in Pennsylvania authority upon which Plaintiff relies in his

brief," Defs.' Reply in Supp. of Defs.' MSJ ("Defs.' MSJ Reply")

at 3, and concluded that "'[a] judgment is deemed final for

purposes of res judicata or collateral estoppel unless or until

46

it is reversed on appeal.'" <u>Id.</u> at 4 (quoting <u>Shaffer</u>, 673 A.2d
at 874-75) (emphasis omitted).

It is true that <u>Shaffer</u> overruled cases standing for
the proposition that "a state court judgment in Pennsylvania is
not considered a final judgment for purposes of <u>res</u> <u>judicata</u> or
collateral estoppel while an appeal is pending," 673 A.2d at 874
n.2.  Importantly, <u>Shaffer</u> considered the preclusive effect of a
criminal conviction in state court -- <u>not</u> an arbitration award.
Given that <u>Shaffer</u> referred to "judgment[s]" and "state court
judgment[s]" in its holdings, it is by no means clear that it
meant it should apply to arbitral awards as well.  Indeed, recent
jurisprudence in Pennsylvania law suggests that it did not.

Several years before <u>Shaffer</u>, the Superior Court of
Pennsylvania reiterated that "[a]n arbitration award from which
no appeal is taken has the effect of a final judgment on the
merits." <u>Dyer v. Travelers</u>, 572 A.2d 762, 764 (Pa. Super. 1990)
(citing <u>Ottaviano v. SEPTA</u>, 361 A.2d 810, 814 (Pa. Super. 1976)).
In 2003 -- seven years after <u>Shaffer</u> was decided -- the Superior
Court of Pennsylvania cited <u>Dyer</u> in explaining that because
"[t]he Robbinses never filed a notice of appeal from the
arbitrator's award entered against Kathleen Robbins in favor of
the Bucks in <u>Buck v. Robbins</u>," the "award became a final

judgment." <u>Robbins v. Buck</u>, 827 A.2d 1213, 1214 (Pa. Super. 2003).  That same year, a Philadelphia Court of Common Pleas cited <u>Ottaviano</u> in explaining, with respect to an arbitration, that since "Judge Gafni has ruled on the issue and AHP has represented that it does not intend to appeal, that ruling constitutes a final order, which has preclusive effect with respect to the issue before Judge Gafni." <u>Axcan Scandipharm, Inc. v. Am. Home Prods.</u>, 2003 WL 21731124, at *2 (Phila. Ct. Com. Pl. 2003).  And just three years ago, Judge Connor explained that "Pennsylvania law considers an arbitration award to be 'final' in either of two circumstances.  Most obviously, an arbitral award is final when it has been judicially confirmed.  State law also treats as final an unconfirmed award from which no appeal is taken." <u>Novinger Grp., Inc. v. Hartford Life & Annuity Ins. Co.</u>, 2008 WL 5378288, at *11 (M.D. Pa. 2008) (internal citations omitted).

Against this authority, the Penn entities present no cases that suggest <u>Ottaviano</u> or <u>Dyer</u> have been reversed with respect to their holdings that only unappealed arbitral awards constitute final judgments for preclusive purposes.  We will thus defer to admittedly non-definitive Pennsylvania case law holding that, notwithstanding the Pennsylvania Supreme Court's decision

in <u>Shaffer</u>, arbitral awards are not final judgments while appeals remain pending.

The Penn entities' motion for partial summary judgment -- which also seeks a determination that certain facts in Del Prete's report are taken as established, and to limit both discovery and the use of evidence -- depends either on the contractually binding nature of Del Prete's report or on the issue preclusive effect of the September 18, 2009 Award.  But as we have explained, the plain language of the Agreement does not make Del Prete's report binding, and the Award does not have issue preclusive effect because an appeal of the Award remains pending.[11]  We thus will deny the Penn entities' motion.

D.    **The Penn Entities' Motion for Costs**

Finally, the Penn entities seek "to require Plaintiff Cataldo Pirito, a resident of Brazil, to provide security for the approximately $244,000 of anticipated recoverable costs that will

---

[11] We recognize that should Pirito's appeal be resolved in the Penn entities' favor, we would then be able to conclude that (1) the Second Arbitration Panel had jurisdiction over the Penn entities' claims, and (2) the September 18, 2009 Award constitutes a final judgment, so that the Award might have issue preclusive effect.  We invite the parties to brief us on whether they would prefer to proceed with discovery at this time or stay proceedings pending resolution of the appeal.

be incurred by Defendants during discovery and the pretrial

proceedings in this matter." Defs.' Mot. Costs at 1. Pirito

responds that "Defendants' estimation of taxable costs, in excess

of $244,000, far exceeds any reasonable assessment of costs for

which Pirito should be obligated to provide security," Pl.'s

Resp. to Defs.' Mot. Costs at 2, though Pirito concedes that

"because he is a foreign citizen, this Court may grant some

manner of the relief requested in the Motion for Costs." Id.

> Loc. R. Civ. P. 54.1(a) provides that
>
>> In every action in which the plaintiff was
>> not a resident of the Eastern District of
>> Pennsylvania at the time suit was brought, or
>> having been so afterwards removed from this
>> District, an order for security for costs may
>> be entered, upon application therefor within
>> a reasonable time and upon notice. In
>> default of the entry of such security at the
>> time fixed by the court, judgment of
>> dismissal shall be entered on motion.

Moreover, under 20 U.S.C. § 1920,

> A judge or clerk of any court of the United
> States may tax as costs the following:
>
>> . . .
>>
>> (2) Fees for printed or
>>     electronically recorded
>>     transcripts necessarily
>>     obtained for use in the case;
>>
>> (3) Fees and disbursements for
>>     printing and witnesses;

(4)   Fees for exemplification and
      the costs of making copies of
      any materials where the copies
      are necessarily obtained for
      use in the case;

      . . .

(6)   Compensation of court
      appointed experts,
      compensation of interpreters,
      and salaries, fees, expenses,
      and costs of special
      interpretation services under
      section 1828 of this title.

Judge Robert Kelly has explained that while Rule 54.1(a) "does

not list specific factors a district court should consider in

requiring a plaintiff to post security," decisions from this

District suggest that a court should "evaluate[] the likelihood

of a plaintiff's ultimate success and a plaintiff's ability to

post security or pay costs in making its determination." Van Bui

v. Children's Hosp. of Phila., 178 F.R.D. 54, 55 (E.D. Pa. 1998).

While Pirito's claims do not seem frivolous,[12] he has

conceded that it would be reasonable to "grant some manner of the

relief requested in the Motion for Costs" given his foreign

citizenship.  We thus need not tarry long on the Van Bui inquiry

---

[12] In making this observation, we measure Pirito's
claims against a low bar; our evaluation should not be taken to
suggest that he is ultimately likely to prevail on the merits.

and instead may proceed directly to consider the Penn entities'
claims for costs.  The Penn entities identify five costs that
they suggest would be taxable against Pirito under § 1920: "costs
of transcribing depositions ($14,560); costs of translation
services at depositions in United States and Europe ($9,800);
costs of videotaping depositions (in Europe) ($12,800); costs of
translating documents produced and collected in discovery
($204,000); copying costs ($3,000)."  Defs.' Mot. for Costs ¶ 17.

        Of these costs, we begin by considering the claim for
"costs of translating documents produced and collected in
discovery."  Id.  The Penn entities argue that "[t]his Court has
. . . confirmed that costs for translation of necessary
documents, including testimony, are recoverable costs under Rule
54."  Defs.' Br. in Supp. of Mot. Costs ("Defs.' Costs Br.") at 9
(citing Lockett v. Hellenic Sea Transps., Ltd., 60 F.R.D. 469,
473 (E.D. Pa. 1973) (Newcomer, J.)).  Pirito responds that
"[t]ranslation costs are not listed as an appropriate cost under
28 U.S.C. § 1920(6)" and cites in support two district court
cases from outside this Circuit, one of which having been
overruled.  Pl.'s Resp. to Mot. Costs at 10.  On the one hand,
courts within this Circuit have taxed the costs of translating
documents under § 1920.  See Lockett, 60 F.R.D. at 473; Lazaridis

v. Wehmer, 2008 WL 4758551, at *1 (D. Del. 2008) (Robinson, J.)
("Had plaintiff prevailed in this action he could have sought the
costs of translation pursuant to 28 U.S.C. § 1920.").  On the
other hand, in legal usage a distinction is often drawn between
translators and interpreters, with the latter appearing to be a
subset of the former.  Translation means "[t]he transformation of
language from one form to another; esp., the systematic rendering
of the language of a book, document, or speech into another
language," Black's Law Dictionary 1637 (9th ed. 2009), while
interpreter means "[a] person who translates, esp. orally, from
one language to another; esp., a person who is sworn at a trial
to accurately translate the testimony of a witness who is deaf or
who speaks a foreign language."  Id. at 895.

    Luckily, we need not resolve the question of whether
"compensation of interpreters" under § 1920(6) includes the cost
of translating documents, because the Penn entities have failed
to support their request for security for such costs with details
sufficient to permit us to conclude that these costs are
necessary.  As Judge Newcomer noted in Lockett, "[n]ecessity is
indeed the proper standard" for determining whether a cost is
taxable.  60 F.R.D. at 473.  The Penn entities merely aver that
"Penn Engineering assumes that it will gather three to four boxes

of documents during discovery in Italian, French or Portuguese that will need to be translated at a cost of $204,000-272,000." Defs.' Costs Br. at 9.  Without more information about these "boxes of documents," we cannot at this juncture determine whether they are necessary to the Penn Entities' defense of this action.  We thus at this time (and without prejudice to later determination on a less vaporous record) deny the request for costs of translating such documents.

The Penn entities' other requests (which total $40,160) are similarly speculative, <u>see</u> Defs.' Mot. Costs ¶¶ 18-20, 22, and we must further discount these requests because Pirito's claims do not appear to be frivolous.  We accept, however, that the Penn entities' are likely to incur significant costs in defending this complex transnational commercial action.  We will accordingly grant in part the Penn entities' motion for security for costs in discovery, in the amount of $20,000.

BY THE COURT:

\_\_\s\Stewart Dalzell