IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CATALDO PIRITO, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENN ENGINEERING WORLD | : | |
| HOLDINGS and PENN ENGINEERING | : | |
| & MANUFACTURING CORP., | : | NO. 2:09 – CV – 02396 (SD) |
| | : | |
| Defendants. | : | |

**AFFIDAVIT OF GIACOMO ROJAS ELGUETA**
*(Signed pursuant to 28 U.S.C. sec. 1746)*

# TABLE OF CONTENT

(page)

PERSONAL BACKGROUND AND QUALIFICATIONS ................................................................. 5
INTRODUCTION ................................................................................................................... 5
A.  APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE EXECUTION OF AN
OPTION ............................................................................................................................... 8
   A.I.   PRINCIPLES OF ITALIAN LAW REGARDING THE EXECUTION OF AN OPTION ........................... 9
   A.II   CRITERIA FOR THE APPLICATION OF THE LEGAL PRINCIPLES TO THE FACTS ........................ 10
      A.II.(*i*)   REAL PROPERTY "OPTION" ...................................................................................... 11

      A.II.(*ii*)   REAL PROPERTY "INCOMPLETE OPTION" ................................................................ 13

B.  APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE S.C. "*ECCEZIONE DI
INADEMPIMENTO*" ............................................................................................................. 14
   B.I.   ARTICLE 1460 OF THE ITALIAN CIVIL CODE .................................................................... 15
      B.I.(*i*)   FUNCTIONAL RECIPROCITY .................................................................................... 15

      B.I.(*ii*)   CHRONOLOGICAL SEQUENCE OF PERFORMANCES .................................................. 16

      B.I.(*iii*)   GOOD FAITH OF THE PARTIES ............................................................................... 16

   B.II   CRITERIA FOR THE APPLICATION OF THE LEGAL PRINCIPLES TO THE FACTS......................... 18
      B.II.(*i*)   FUNCTIONAL RECIPROCITY ................................................................................... 19

      B.II.(*ii*)   CHRONOLOGICAL SEQUENCE OF PERFORMANCES................................................ 20

      B.II.(*iii*)   GOOD FAITH OF THE PARTIES ............................................................................. 21

C.  APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE S.C. "*DOLO*" ......... 23
   C.I.   ARTICLES 1439-1440 OF THE ITALIAN CIVIL CODE .......................................................... 24
      C.I.(*i*)   THE MISREPRESENTATION...................................................................................... 24

      C.I.(*ii*)   THE JUSTIFIABLE RELIANCE .................................................................................. 25

      C.I.(*iii*)   THE CONSEQUENT ALTERATION OF THE CONSENT OF THE RECIPIENT ...................... 26

   C.II   CRITERIA FOR THE APPLICATION OF THE LEGAL PRINCIPLES TO THE FACTS......................... 28
      C.II.(*i*)   THE MISREPRESENTATION .................................................................................... 28

      C.II.(*ii*)   THE JUSTIFIABLE RELIANCE ................................................................................ 29

      C.II.(*iii*)   THE CONSEQUENT ALTERATION OF THE CONSENT OF THE DEFENDANTS ................. 30

D.  APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE S.C. "PRE-
CONTRACTUAL LIABILITY" AND THE DOCTRINE OF THE S.C. "*ERRORE*" ................... 31
   D.I.   ARTICLES 1337, 2043, 1428, 1429 AND 1431 OF THE ITALIAN CIVIL CODE......................... 31
      D.I.(*i*)   ARTT. 1337 AND 2043 OF THE I.C.C.: THE "PRE-CONTRACTUAL LIABILITY" .............. 32

      D.I.(*ii*)   ARTT. 1428, 1429 AND 1431 OF THE I.C.C.: THE DOCTRINE OF "*ERRORE*" ................. 33

# TABLE OF AUTHORITIES

ITALIAN CASES

*Ghibellini* vs. *Borgesi* (Cassazione civ. Sez. II, 10/09/2004, n. 18201)..........................................9

*Soc. Ombrone* vs. *Michienzi* (Cassazione civ. Sez. III, 29/10/1993, n. 10777).....................9; 13

*Ates s.r.l.* vs. *fall. Sart s.a.s.* (Cassazione civ. Sez. III, 14/03/2003, n. 3787)..........................16

*Boldini* vs. *Borghese* (Cassazione civ. Sez. I, 04/02/2009, n. 2720)......................................17

*Soc. Nuova Bellaria 80* vs. *Soc. Sporting Novi Pasturana e altri* (Cassazione civ. Sez. II, 16/01/1997, n. 387)..........................................................................................18; 23

*Delliani* vs. *Lami* (Cassazione civ. Sez. II, 20/04/2006, n. 9253).........................................24

*B.G. and Altro* (Cassazione pen. Sez. II, 13/06/2012, n. 30686)..........................................25

*Airon s.r.l. c. Soliani* (Cassazione civ. Sez. III, 27/10/2004, n. 20792).............................25; 29

*De Muro* vs. *Lavacca* (Cassazione civ. Sez. Unite, 11/03/1996, n. 1955).............................27

*R.G.* vs. *Banco di Sicilia S.p.A.* (Cassazione civ. Sez. I, 19/09/2006, n. 20260)......................27

*Benazzo* vs. *Ist. Bancario San Paolo Imi S.p.A.* (Cassazione civ. Sez. I, 29/09/2005, n. 19024)..................................................................................................27; 32; 33

*Fin.Com. Valori s.r.l. in liquidazione e altri v. Ist. Bancario San Paolo Imi S.p.A.* (Cassazione civ. Sez. Unite, 19/12/2007, n. 26724)................................................................32; 33

*I.r.co.s.s. s.r.l. in liquidazione v. Iritech S.p.A.* (Cassazione civ. Sez. III, 19/07/2007, n. 16031)..........................................................................................................34


ITALIAN CIVIL CODE ARTICLES

Artt. 1175; 1331; 1337; 1366; 1375; 1428; 1429; 1431; 1439; 1440; 1460; 2043.


U.S. CASES

*McArthur v. Rosenbaum Co. of Pittsburgh*, 180 F.2d 617, 619-20 (3d Cir. 1950)....................11

*Holiday Inns of America v. Knight*, 70 Cal.2d 327, 74 Cal.Rptr. 722, 450 P.2d 42, (1969) (Traynor, C.J.)..............................................................................................................11

*Raymond Rosen & Co.* vs. *Seidman & Seidman*, 48 Pa. D. & C.3d 411 (C.P. 1988)..................25


OTHER ITALIAN AUTHORITIES

LIPARI & RESCIGNO (EDS.), *DIRITTO CIVILE*, vol. III/II, Milano: Giuffrè (2009).......................14

ROPPO, *IL CONTRATTO*, Milano: Giuffrè (2nd ed. 2011)....................................17; 24; 25; 27

GAZZONI, *MANUALE DI DIRITTO PRIVATO*, Napoli: E.S.I. (11th ed., 2004)...........................24; 25

BIANCA, *DIRITTO CIVILE*, vol. 3, Milano: Giuffrè (2000)....................................25; 32; 33

<u>OTHER U.S. AUTHORITIES</u>

23 *WILLISTON ON CONTRACTS* § 63:3, p. 438, p. 666 (4th ed., 2002)..............................................15; 16

*AMERICAN LAW INSTITUTE, RESTATEMENT (SECOND) OF CONTRACTS*, 1991, § 25 (1981).................9; 11

*AMERICAN JURISPRUDENCE*, § 688, p. 648 (2nd ed., 2004)................................................................16

*PENNSYLVANIA LAW ENCYCLOPEDIA*, vol. 25 (2nd ed., 2002)......................................................9; 24; 25

I Avv. Giacomo Rojas Elgueta declare as follows:

## PERSONAL BACKGROUND AND QUALIFICATIONS

1.    I am an Assistant Professor of Civil Law at Roma Tre University (Rome, Italy) and a practicing lawyer at the firm Studio Legale Rubini in Milan, Italy. I am a member of the Italian Bar (admitted in 2004) and of the New York Bar (admitted in 2010). I earned both my law degree (J.D.) (2001, *summa cum laude*) and my doctoral degree in Italian and European Civil Law (2005), with distinction, from Roma Tre University. In 2003-2004 and in the fall semester of 2006, I served as a Visiting Scholar at the Yale Law School, at the invitation of Judge Guido Calabresi. In 2008, I received an LL.M with distinction from the University of Pennsylvania Law School, where I am currently a candidate for an S.J.D. (Doctor of Juridical Sciences) degree. I published two books and several articles, covering different Italian and comparative Civil Law topics, in the most prestigious Italian Law Reviews. In addition, in 2010, I published an article on Comparative Corporate Law in the University of Pennsylvania Journal of Business Law and, in 2011, an article on International Commercial Arbitration in the Harvard Negotiation Law Review. Appointed by the Italian Ministry of Justice, from January 2012 until October 2012, I assisted in drafting the new Italian Consumer Bankruptcy Law. A copy of my *curriculum vitae*, including my full educational and professional background as well as a list of my publications, is attached as Exhibit A.

## INTRODUCTION

2.    I have been requested by Richard G. Placey and Julie H. Chelius (Montgomery, McCracken, Walker & Rhoads, LLP) to address some issues of Italian Contract Law that appear to be relevant in the Civil Action No. 2:09-CV-02396 (SD) pending before the "United States District Court for the Eastern District of Pennsylvania" between Cataldo Pirito (hereinafter "Plaintiff" or "Pirito") and Penn Engineering World Holdings, LP ("Penn World") and Penn Engineering & Manufacturing Corp. ("Penn Engineering", and together with Penn World "Defendants").

3.   In connection with this engagement I have reviewed the pleadings and attached exhibits, including the relevant portions of the Share Purchase Agreement (hereinafter "S.P.A." or "Agreement"), and various briefs in this matter. In addition I have reviewed relevant Articles of the Italian Civil Code (Exhibit 1) and opinions of the Corte di Cassazione as well as legal treaties regarding Italian Law and Pennsylvania Law.

4.   Based on my review of the pleadings, in general the factual background can be summarized as follows:

   *a)*   On January 23, 2003 Pirito and Penn World entered into an Agreement, pursuant to which Penn World agreed to purchase from Pirito the outstanding shares of Maelux SA, a Luxemburg corporation, thus indirectly acquiring all the capital stock of MAE S.p.A., an Italian manufacturing company;

   *b)*   In the Agreement, Pirito represented that the net worth of the acquired company would be no less than € 815.821, and agreed to reimburse Penn World for any difference between the guaranteed minimum net worth and the actual net worth as of February 5, 2003, as date of the closing (the "Net Worth Deficit");

   *c)*   Sec. 2(d) of the S.P.A. set forth the mechanism for determining the Net Worth Deficit and provided for this determination to be final and binding for Pirito and Penn World;

   *d)*   Within months of the closing under the Agreement, a dispute arose regarding, *inter alia*, the net worth of Maelux: on October 2007, an accounting Expert, Dr. Marcello Del Prete, appointed by the Court of Milan, issued a report determining the net worth (that resulted in negative € 669,856) and the Net Worth Deficit (€ 1,485,677);

   *e)*   In order to solve these disputes, Penn World has filed two arbitrations under the procedures of the Agreement, one in January 2005 and a second in March 2008, in the Milan Chamber of Arbitration: four arbitration decisions were then issued, and there are no arbitrations presently pending;

*f)*    On May 27, 2009, Pirito filed a Complaint against Penn World and Penn Engineering for breach of contract, focusing in particular on Sec. 2(f) of the S.P.A. ("Real Property Agreement"), which defines a procedure (the s.c. "Call-Option") for the transfer to Pirito of the land and building owned by MAE S.p.A. in Offanengo, Italy (hereinafter the "Real Property");

*g)*    In the pending case No. 2:09-CV-02396 (SD), while Plaintiff avers to be entitled to the transfer of the Real Property and demands judgement in his favour and an award of compensatory damages for breach of contract, Defendants argue, *inter alia*, that the "Call-Option" has not been exercised in accordance with the S.P.A., that the Plaintiff has breached the contract and that Pirito has committed fraud.

5.    Since my understanding is that the Agreement, pursuant to Sec. 13(h), is governed by and construed in accordance with the laws of Italy, I have been requested to address several aspects of Italian Contract Law and in particular those regarding:

A)    The rules governing an option agreement, as defined by Article 1331 of the Italian Civil Code (hereinafter "I.C.C.");

B)    The rules of the so called (s.c.) *"eccezione di inadempimento"*, as defined by Art. 1460 I.C.C., pursuant to which in bilateral contracts one party is entitled not to perform his/her obligation given the breach of the other party;

C)    The rules regarding the s.c. *"dolo"*, as defined by Artt. 1439 and 1440 I.C.C., which are consonant with the common law doctrine of contract fraud;

D)    The rules of the I.C.C. regulating the s.c. "pre-contractual liability", regulated by Artt. 1337 and 2043 and the s.c. doctrine of *"errore"* (translatable as "mistake"), regulated by Artt. 1428, 1429 and 1431.

6.    As a matter of background, the Italian legal system is a civil law system based on written statutes. The relevant statute in this case is the Italian Civil Code, which regulates, among other

matters, Italian Contract Law. The statutes, which set forth general and abstract principles, are then interpreted and applied by Italian Courts. The Italian judicial system is structured in three levels: Tribunali (trial Courts), Corti di Appello (intermediate appellate Courts) and Corte di Cassazione (Supreme Court). In the Italian judicial system there is also the Corte Costituzionale (Constitutional Court), which verifies whether the statutes are consistent with the Italian Constitution. As to the present case, I refer in this affidavit to the precedents of the Corte di Cassazione[1]. As the final appellate court, the Corte di Cassazione restricts its review to whether the lower court made the correct legal determinations, rather than hearing direct evidence or determining what the facts of the case were. The opinions of the Corte di Cassazione are not considered precedents, or binding on the lower courts. The lower courts however typically follow these opinions as the Corte di Cassazione has the power to overturn the lower court decisions where they have misapplied the statutes.

## A. APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE EXECUTION OF AN OPTION

7. In this part, I will address the rules governing an option agreement under Italian law. With particular reference to the case of a real property sale contract under an option, I will focus on the conditions that a prospective buyer must satisfy under Italian law to be entitled to the transfer of the property from the prospective seller.

---

[1] In this affidavit, I refer to excerpts of relevant Corte di Cassazione's opinions, referred to as *Massima*, along with translations. The *Massima* is the portion of a Corte di Cassazione's opinion in which the holding of the Court is typically set forth. The *Massime*, rather than the full cases, are routinely cited by Italian lawyers and judges. The *Massime* are publicly distributed by an office of the Corte di Cassazione (*Ufficio del Massimario*) or by legal publishers. Because of the significant length of the Italian judicial opinions, because they are not in English, and because of the accepted practice of citing *Massime* rather than full cases I have not attached the cases in this matter. If needed I will supply the full copies of the cases I have reviewed and cited. I have attached copies of the relevant cited *Massime* and of the treaties as Exhibits in an Appendix. These documents are listed in alphabetical order.

**8.**    According to Art. 1331 I.C.C.[2], an option is a bilateral agreement, which sets forth the fundamental provisions of a future contract, binding one party (the optionor, s.c. *"promittente"*) to maintain the set conditions of the offer for a given period, during which the other party to the agreement (the optionee, s.c. *"promissario"*) has the right to declare his/her acceptance of the final contract (*i.e.* to exercise the option), thus making it effective[3].

**9.**    As recently stated by Italian Supreme Court in *Ghibellini* vs. *Borgesi* (Cass. n. 18201/ 2004), according to the I.C.C., in order to be interpreted as a binding option, the original agreement must have specified all the essential elements of the final contract, so that, at the moment of the acceptance by the optionee, the contractual effects (roughly translated as rights and obligations) can be perfected among the parties without the need of any further fulfilment or formality.

**10.**    In case of an agreement concerning the future sale of a real property, it is derived from the aforementioned principle that if the parties have deferred to further arrangements the determination of some of the deal's elements (*e.g.* those concerning the nature of the goods exchanged or the price amount), then the agreement cannot be technically considered as a legal option, and the mere declaration of execution delivered by the optionee (*i.e.* the mere acceptance) is not sufficient to perfect his/her right to have the property transferred from the optionor.

**11.**    Coherently, in the case *Soc. Ombrone* vs. *Michienzi* (Cass. n. 10777/1993), specifically concerning a real property contract, the Italian Supreme Court clarified that when the preliminary agreement is incomplete, leaving undefined some essential terms of the real property sale (such as,

---

[2] A copy of Article 1331 and of all Articles of the I.C.C. cited in this is affidavit (in English and in Italian) is attached as Exhibit 1.
[3] This basic notion is consistent with the one of U.S. Contract Law, where an option may be defined as «a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer» [*see*, AMERICAN LAW INSTITUTE, RESTATEMENT *(SECOND) OF CONTRACTS* § 25 (1981)]; or, similarly, as a «contract to keep an offer open for a specified time [...]. Once accepted by the optionee, the option is a valid and binding contract»: see PENNSYLVANIA LAW ENCYCLOPEDIA (2nd ed., 2002), Ch. 6, §169, p. 244.

in that case, those regarding the terms of payment due by the buyer), the explicit acceptance by the optionee is not sufficient to perfect the transfer of the property, but the acceptance is at most capable of binding the parties to discharge the further duties that have been arranged in contemplation of the conclusion (finalization) of the future contract.

12. Italian Law distinguishes between a binding option, that specifies all the essential elements of the final contract, and a bilateral agreement that lacks some of those essential elements. On this basis, as a mere operative categorization relevant for the foregoing analysis, it is possible to introduce a distinction between:

   *i)* An "**Option**": meaning a bilateral agreement establishing all the elements of a future contract, which will be perfected just through the declaration of acceptance made by the optionee; and

   *ii)* A bilateral agreement that lacks some of the essential elements of the final contract, and that, after the declaration of the optionee, binds the parties to fulfil the reciprocal obligations and procedures agreed upon in order to cause the conclusion (finalization) of the final contract and to make it valid and binding (I will refer to this second concept as an **option lacking some essential elements or an "Incomplete Option"**).

A.II   *CRITERIA FOR THE APPLICATION OF THE LEGAL PRINCIPLES TO THE FACTS*

13. Given the above, when interpreting an agreement concerning a future real property sale, in order to verify when its final effects are perfected, an Italian Court would proceed in the following terms:

   *i)* Where the agreement is an **Option**, the prospective buyer will be considered entitled to the property just upon his/her explicit acceptance sent to the optionor. Because of the acceptance, parties are expected to discharge mere duties of implementation of the final contract (*i.e.* the duty to transfer the property to the buyer; the duty to pay the sale price to the seller);

*ii)*     Where the agreement is an **Incomplete Option**, the final effects of the sale contract will depend on the fulfilment by the parties of the procedures and of the obligation to negotiate necessary to specify the unsettled elements of the final contract. If the Court finds that the prospective buyer has not satisfied the foregoing obligations or procedures, his/her right to have the property transferred cannot be regarded as perfected[4].

### A.II.(*i*)     REAL PROPERTY "OPTION"

14.     Applying the principles defined at ¶ 13 to this case, an Italian Court would consider the Real Property Agreement perfected just with the delivery of the written notice pursuant to Sec. 2(f)(ii) only after having determined that the terms of the S.P.A. can be regarded as an Option in the sense described under ¶ 12(*i*).

15.     To this task, in interpreting the terms of the Real Property Agreement, an Italian Court would have to verify whether the exact computation of the Real Property Payment Amount due by the buyer has been already determined in the S.P.A. or it is rather dependent on subsequent parties' arrangements and fulfilments.

16.     In making this decision an Italian Court would look at the provisions of Sec. 2(f)(iii) S.P.A., stating that[5]:

---

[4] Comparatively, this principle seems to be coherent with the one acknowledged by U.S. case law. According to *McArthur v. Rosenbaum Co. of Pittsburgh*, 180 F.2d 617, 619-20 (3d Cir. 1950): «[w]hen contracts are optional in respect to one party, they are strictly interpreted in favor of the party bound and against the party that is not bound. In an option the optionor is not bound beyond the point where the words of the option clearly and definitely bind him. *Where, as in the present case, the words of the option are ambiguous, the optionor is not bound at all because the court cannot say to what obligation he is bound*» (emphasis added). Similarly, U.S. Courts have stated that: « Despite equity's dislike of forfeitures, ... requirements governing the time and manner of exercise of a power of acceptance under an option contract are applied strictly. It is reasoned that any relaxation of terms would substantively extend the option contract to subject one party to greater obligations than he bargained for». *See*, RESTATEMENT (SECOND) OF CONTRACTS § 25 cmt(d) citing, *inter alia*, *Holiday Inns of America v. Knight*, 70 Cal.2d 327, 74 Cal.Rptr. 722, 450 P.2d 42, (1969).

[5] Please note that the S.P.A. refers to Penn World as the Buyer and to Pirito as the Seller while I use the term "buyer" to indicate the prospective buyer of the Real Property, Cataldo Pirito.

«[…] Promptly upon delivery of the written notice provided pursuant to subsection (i) or (ii) above, the Buyer shall compute the amount owed by the Seller pursuant to clause (Y) (the "Real Property Payment Amount") and provide notice of such computation to the Seller. Within fifteen business days, the Seller shall provide to the Buyer a written response (the "Response Notice") in which the Seller shall (i) agree that the proposed Real Property Payment Amount is accurate or (ii) disagree that the proposed Real Property Payment Amount is accurate. […] If the Seller provides a Response Notice indicating that the Real Property Payment Amount is inaccurate, then the Parties shall negotiate such matter in good faith for fifteen business days. If no resolution can be reached by the end of such period, the decision shall be submitted upon request of either or both Parties to a sole arbitrator to be appointed by the President of the National and International Arbitration of Milan; such arbitrator shall determine the Real Property Payment Amount as defined herein according to Article 1349 of the Italian Civil Code».

17.     In this regard, an Italian Court would also find extremely relevant the alleged fact, if proven, that the Real Property Payment Amount could not be exactly determined when Penn World and Pirito (hereinafter the "Parties") entered into the S.P.A. in January 2003, since «In the event there are outstanding amounts owed at the end of the three year period ... the Real Property Payment Amount will be increased by such amount» (Sec. 2(f)(vii) S.P.A.). Penn alleged that those outstanding amounts were disputed and subject to an arbitration [as indicated in _Defendants, Defenses and Counterclaims - August 17, 2009_, p. 41, ¶ 157, referring to the provisions of Sec. 2(f)(vii) S.P.A.:

«In the event there are outstanding amounts owed at the end of the three year period by the Seller to the Buyer for any matter with respect to this Agreement, including the obligations described under Section 2(e)(i) through (iv) and the obligation to pay the Reduction Amount, the Real Property Payment Amount will be increased by such amount, provided, however, that no increase will be made for amounts for which a claim is pending under the Escrow Agreement. In the event that any portion of such outstanding amounts is then subject to an arbitration proceeding but not subject to a claim under the Escrow Agreement, the disputed amount shall be placed in Escrow pending a decision of the arbitrator […]».

In light of the above considerations, under Italian Law, if the Court finds that the s.c. "Call-Option" lacks some of the essential elements of the final contract, an Italian Court would treat it as an Incomplete Option as described at ¶ 12(*ii*).

A.II.(*ii*)    REAL PROPERTY "INCOMPLETE OPTION"

18.    In the case of an Incomplete Option as described at ¶ 12(*ii*), in order to verify if the right to the transfer of the Real Property has been perfected, an Italian Court would evaluate whether the conducts of the Parties have been in compliance with the obligations and procedures set forth in Sec. 2(f) of the S.P.A. for the perfection of the Real Property Agreement. Until the obligations and procedures set forth in Sec. 2(f) of the S.P.A. are complied with the optionee does not obtain the right to purchase the Real Property [*Soc. Ombrone* vs. *Michienzi* (Cass. n. 10777/1993)].

19.    In this regard, an Italian Court would consider highly relevant the behaviour held by Pirito and Penn World after the first Notice sent by Pirito on February 22, 2005 with which the Plaintiff declared his willingness to exercise the s.c. "Call-Option" defined in Sec. 2(f) S.P.A.

20.    In particular, considering the procedure defined by aforementioned Sec. 2(f)(iii) S.P.A. for the computation of the Real Property Payment Amount in case of initial disagreement among the Parties, Italian Courts would consider relevant, if proven, the alleged facts that although no resolution was reached on the Property Payment Amount through the negotiation letters exchanged among the Parties between February 22, 2005 and April 28, 2005, Pirito, as interested party, has not acted to have the Real Property Payment Amount established and in particular to request

> «a sole arbitrator to be appointed by the President of the National and International Arbitration of Milan; [in order to] determine the Real Property Payment Amount as defined herein according to Article 1349 of the Italian Civil Code».

21.    Moreover, under Italian law, great weight would be given to the fulfilments of the Real Property Agreement that states that after giving notice the real estate buyer (Pirito) is to:

(X)     "either pay off or assume the outstanding debt service obligation for the Real Property "; and

(Y)     pay the Company ... the Real Property Payment Amount» [defined in detail in Sec. 2(f)].

22.     Given the above, considering the Real Property Agreement as an Incomplete Option, an

Italian Court would state that Pirito has not perfected his right to the transfer of the Real Property if

the Court determines that Pirito did not fulfil all the requirements of Sec. 2(f) S.P.A. or behaved in

bad faith (as defined at ¶¶ 29-30) in his effort to satisfy the s.c. "Call-Option". For example[6], if

proven to the Court, an Italian Court would give great weight to the alleged facts that:

*a)*     There were outstanding amounts claimed to be owed by Pirito at the time of the notice, for

example the Net Worth Deficit;

*b)*     These amounts were disputed and in fact an arbitration was pending at that time;

*c)*     The procedure of Sec. 2(f)(vii) were not followed by Pirito with respect to the disputed amounts

(*e.g.*, providing for various steps including the "disputed amounts shall be placed in Escrow

pending a decision of the arbitrator").

[*see* the requirements of Sec. 2(f)(vii)].

## B.     APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE S.C. *"ECCEZIONE DI INADEMPIMENTO"*

23.     In this part, I will focus on the rules governing the s.c. *"eccezione di inadempimento"*

(literally, "non-performance exception") devised by Art. 1460 I.C.C. [7] In particular, I will address

under what conditions an Italian Court, in case of a contract imposing reciprocal obligations, would

find justified one party's refusal to perform his/her obligation when the other party to the contract

---

[6] As an explanation of the Italian Courts' methodology examples are given in this affidavit of facts that the Italian Courts would consider in making their determinations. When examples are given they are not intended to indicate that all of such facts would have to be proven to an Italian Court or that they are the exclusive facts or set of facts that the Courts would consider. Rather they are an illustration of how Italian Courts apply the legal principle.

[7]     Art. 1460 I.C.C. states in full: **«Defense based upon non-performance**. In contracts providing for mutual counterperformance, each party can refuse to perform his obligation if the other party does not perform or does not offer to perform his own at the same time, unless different times for performance have been established by the parties or appear from the nature of the contract.

However the performance cannot be rejected if considering the circumstances, such rejection is contrary to good faith».

has not fulfilled, or has refused to perform simultaneously, his/her obligation [among Italian scholars, *see* LIPARI & RESCIGNO (EDS.), *DIRITTO CIVILE*, vol. III/II, Milano: Giuffrè (2009), p. 1153].

## B.I.   *ARTICLE 1460 OF THE ITALIAN CIVIL CODE*

24.   As mentioned above, Art. 1460 I.C.C. applies in bilateral contracts when one party seeks to excuse his/her non-performance based on the prior breach of the other party[8].

25.   More specifically, in order to verify if one party is entitled not to perform his/her obligations given the breach of the other party, Italian Courts must make a comparative evaluation of parties' behaviours taking into account several elements, classifiable as follow:

   *i)*     The **functional reciprocity (or connectivity)** among the unfulfilled obligations;

   *ii)*    The **chronological sequence** of the unfulfilled performances;

   *iii)*   The standard of **good faith** of the parties in the implementation of the contract.

### B.I.(*i*)      FUNCTIONAL RECIPROCITY

26.   The element of functional reciprocity requires Italian Judges to compare the actions of two parties who have failed to perform under the contract and determine if the performances were tied together under the terms or the purpose of the contract. In other words, the functional reciprocity element requires the Court to decide if the fulfilment of the breached obligation is necessary to preserve the economic equilibrium or function (*i.e.* the consideration) of the agreement, as originally devised according to the interests of the parties. Under Art. 1460 I.C.C., if that fulfilment is necessary there is reciprocity between the obligation originally breached and the performance subsequently refused.

---

[8] This legal remedy resembles the rationale of the U.S. Contract Law rule, according to which a party who commits a material breach (*i.e.* one that is fundamental and that goes to the root of the contract), cannot enforce the agreement. In such a circumstance, the other party is excused from performing his contractual obligations and the breaching party cannot recover damages for the party subsequent non-performance [see *WILLISTON ON CONTRACTS* § 63:3, p. 438, (4th ed., 2002)].

**27.**     In its formal interpretation, the chronological element implies that one party can legitimately exercise the defense of Art. 1460 I.C.C., and therefore be excused from his/her non-performance, only when the other party's obligation had to be performed first, or, at least, simultaneously.

**28.**     This basic rule is nonetheless subject to exceptions: in particular, as stated by Italian Supreme Court [*see,* among others cases, *Ates s.r.l.* vs. *fall. Sart s.a.s.* (Cass. n. 3787/2003)], a party can raise the *"eccezione di inadempimento"* defense even if his/her obligation had to be fulfilled first, on the condition that the other party has already declared his/her intention not to perform[9], or when it appears certain or highly probable that he/she will not be able to fulfil his/her obligations.

B.I.(*iii*)     GOOD FAITH OF THE PARTIES

**29.**     The third element of the *"eccezione di inadempimento"* defense is the standard of good faith, which, more broadly, under Italian law, governs the entire spectrum of debtors-creditors relations (Art. 1175 I.C.C.) and that must be observed by the parties during their entire contractual relation[10]. The parties are expected to abide by the good faith standard throughout the entire life of a contract and, in particular, during the negotiations (Artt. 1337 I.C.C.)[11], while interpreting the contractual terms (Art. 1366 I.C.C.)[12] and during the implementation of the agreement (Art. 1375 I.C.C.)[13].

---

[9] In this aspect, the Italian *"eccezione di inadempimento"* defense is consistent with the common law doctrine of "repudiation of contract", according to which «[a]fter one party to a contract repudiates it or refuses to perform, the other party is not obliged to perform, nor, as a consequence, becomes liable for damages» (see, AMERICAN JURISPRUDENCE, 2d, Thomson West, 2004, § 688, p. 648). Comparatively, it is possible to find a common rationale of these principles in the prevention of economic waste, «in the sense that, following a clear repudiation, the other party should not be required to perform the formal, economically wasteful, and useless act of further performing» (*see,* WILLISTON ON CONTRACTS, § 39:37, cit., p. 666).

[10] Art. 1175 I.C.C. states in full: «**Fair Behavior.** The debtor and the creditor shall behave according to rules of fairness».

[11] Art. 1337 I.C.C. states in full: «**Negotiations and pre-contractual liability.** The parties, in the conduct of negotiations and the formation of the contract, shall conduct themselves according to good faith».

[12] Art. 1366 I.C.C. states in full: «**Interpretation according to good faith.** The contract shall be interpreted according to good faith».

30. In particular, Italian Contract Law defines "good faith" as an objective standard of behaviour inspired by principles of fairness and probity, according to which parties are required not just to formally fulfil their obligations, but also to take into consideration the wider interests of the other party. Therefore, the standard of good faith enlarges the scope of parties' formal (or written) duties and requires each party to protect the other's interests and to cooperate with one another [*see*, among others authorities, ROPPO, *IL CONTRATTO*, Milano: Giuffrè (2nd ed., 2011), 465-470].

31. Accordingly, the standard of good faith plays a relevant role also in the application of the "*eccezione di inadempimento*" defense, where Courts must take into consideration the behaviour of both:

    *a)*      The party that raises the defense of Art. 1460 I.C.C.;

    *b)*      The party that (at least, allegedly) is in breach.

32. As for the party raising the defense [*sub* ¶ 31(*a*)], Art. 1460, par. 2, I.C.C. explicitly states that the "*eccezione di inadempimento*" defense cannot be raised when the refusal to perform would be in contrast with the standard of good faith.

33. In this regard, the standard of good faith prevents a party from successfully raising the "*eccezione di inadempimento*" defense when the breaching party's non-performance is not material compared to the economic equilibrium or function (*i.e.* the consideration) of the agreement or, put it differently, when the non-performance is trivial [as recently confirmed by the Italian Supreme Court in the case *Boldini vs. Borghese* (Cass. n. 2720/2009)].

34. As for the breaching party [*sub* ¶ 31(*b*)], the standard of good faith, in the light of Art. 1460 I.C.C, plays a crucial role to evaluate the significance of his/her original breach. In general terms, as already mentioned (*see* ¶ 30), the standard of good faith requires Courts to take into account not only the main obligations explicitly agreed upon in the contract, but also the collateral obligations,

---

[13] Art. 1375 I.C.C. states in full: «**Performance according to good faith.** The contract shall be performed according to good faith».

arising under the good faith standard, to protect the other party's interests and to cooperate. In the context of Art. 1460 I.C.C., the Italian Supreme Court has applied this principle stating that, even in case of fulfilment of the main obligations, the breach of "good faith-duties" by one party may legitimately entitle the other party to raise the *eccezione di inadempimento*" defense and, therefore, to refuse his/her performance [*see Soc. Nuova Bellaria 80 vs. Soc. Sporting Novi Pasturana e altri (Cass. n. 387/1997)*].

B.II   *CRITERIA FOR THE APPLICATION OF THE LEGAL PRINCIPLES TO THE FACTS*

**35.**   In this subsection, I explain the aforementioned principles of Art. 1460 I.C.C. in the context of the Real Property Agreement devised by the Parties, with particular reference to the obligations related to the transfer of the Real Property from Penn World to Pirito. The following analysis would be relevant only in case the trier of fact, given the applicable principles of the option described above, would consider the option timely exercised and perfected by Pirito and therefore disregard the potential defenses arising from Section A. Only in such a circumstance, it is necessary to proceed to determine if one party of the S.P.A. may be entitled not to perform a specific obligation in application of the "*eccezione di inadempimento*" defense. To this task an Italian Court would have to assess:

*i*)   The "functional reciprocity" among the alleged breaches of Pirito and the refusal to transfer the Real Property by Penn World;

*ii*)   The chronological succession of the original breach and the subsequent refusal to perform;

*iii*)   The Parties' behaviour in the light of the standard of good faith.

### B.II.(*i*)    FUNCTIONAL RECIPROCITY

36.    In evaluating the refusal of Penn World to transfer the Real Property, an Italian Court would, first, have to verify the presence of a breach of the Agreement perpetrated by Pirito and, second, to determine reciprocity between the unfulfilled performances of the Parties.

### B.II.(*i*)(*a*)    *Presence of a Breach*

37.    As to the breach, it would be of great weight to an Italian Court if the very Section of the Agreement on which Pirito relies for his claim to the Real Property – *i.e.* Sec. 2(f) S.P.A. – imposed upon him specific escrow and security requirements and if it were proven that Pirito failed to fulfil these requirements.

38.    In particular, with respect to the breach, it would be necessary for an Italian Court to determine if, at the time of his first attempt to exercise the s.c. "Call-Option" (February 22, 2005), Pirito did not comply with those provisions of the Real Property Agreement requiring him to pay or if disputed escrow "the outstanding debt services obligation for the Real Property" and "the Real Property Payment Amount" which is defined in detail in Sec. 2(f) of the S.P.A.

39.    As to the breach, an Italian Court would also determine if, at the time of the exercise, Pirito was already in breach of other provisions of the S.P.A. including Sec. 2(e) S.P.A. requiring maintenance of certain funds in Escrow.

### B.II.(*i*)(*b*)    *Functional Reciprocity Between Performances*

40.    If the breach is found, including a breach of any of the above items, the Court must verify the existence of the "functional reciprocity" between the performances:

- As to Pirito, to pay or secure Penn World by funding the Escrow as required by the Real Property Agreement; and

- As to Penn World, to transfer the Real Property.

**41.**   More explicitly, this means determining if the economic purpose of the Real Property Agreement requires payment or security in favour of Penn World, in terms of actual payment (or placement in escrow) of all the "outstanding amounts" owed (or disputed in arbitration) by Pirito at the time the Seller is transferring the property. As discussed above (*see* ¶ 26), if fulfilment of the breached obligation is necessary to preserve the economic equilibrium of the agreement, under Art. 1460 I.C.C. there is reciprocity.

**42.**   In practical terms, for an Italian Court would be fundamental to decide whether, as alleged by the Defendants, the Escrow has a «critical nature and significance» for the economic equilibrium of the entire Agreement.

**43.**   In deciding whether the Escrow has a critical and significant nature, an Italian Court would give weight to the fact that the Escrow was a mechanism agreed upon by the Parties «to secure for Penn World prompt performance and payment of all of the other covenants, agreement and indemnification of the Seller (Pirito)» [*see* Sec. 2(e) S.P.A.], and would proceed to determine whether Sec. 2(f) S.P.A., including 2(f)(vii), was intended to require Pirito to secure Penn World by depositing into Escrow the amount of the pending claims in arbitration in order to buy the Real Property.

**44.**   If an Italian Court agrees with this interpretation of the Agreement the element of reciprocity, under Italian law, would be considered met.

B.II.(*ii*)        CHRONOLOGICAL SEQUENCE OF PERFORMANCES

**45.**   In evaluating the justification of Penn World's refusal to transfer the Real Property at the time of Pirito's attempt to exercise the "Call-Option", an Italian Court would have to determine the chronological relation between the Penn World's refusal and the allegedly breached contractual obligations of Pirito to escrow the outstanding amounts subject to an arbitration proceeding, pursuant to Sec. 2(f)(vii) S.P.A., and the additional amounts required by Sec. 2(e) S.P.A. This element would be met if the breached obligations of Pirito occurred prior to or at the same time Penn World refused to transfer the Real Property.

46. If a Court determines that Pirito has breached the obligation to fund the Escrow according to Sec. 2(f)(vii) S.P.A. and/or Sec. 2(e) S.P.A. and finds the existence of a reciprocity with the obligation of transferring the Real Property (*see* B.II.*i*), the chronological element would be certainly met if it is proven to the Court that the written notice required for the exercise of the "Call-Option" was sent by Pirito on February 22, 2005, when there were already contested amounts, not present in the Escrow, pending before the arbitration proceeding filed by Penn World on January 26, 2005.

### B.II.(*iii*)     GOOD FAITH OF THE PARTIES

47. As already clarified, in applying Art. 1460 I.C.C. and in particular the standard of good faith, an Italian Court must take into consideration the behaviours of both:

    *a)*     The party that raises the non-performance defense (in this case, supposedly, Penn World);

    *b)*     The party that (at least, allegedly) has breached the contract (in this case, supposedly, Pirito).

### B.II.(*iii*)(*a*)     *Good Faith - Behaviour of Penn World*

48. As for Penn World, under Italian law the refusal to cause the transfer of the Real Property would be considered legitimate and consistent with the standard of good faith if it were counterbalanced by a material breach of Pirito's contractual obligations[14].

49. Again, an Italian Court would find that Penn's refusal was in good faith if it determines, as set forth in detail above at ¶¶ 41-42, that the Escrow was necessary to preserve the economic equilibrium or function of the Agreement or, said in other words, that Pirito's failing to fund the escrow affected the purpose of the contract in an important way.

---

[14] A material breach is a breach capable of altering the equilibrium of the contractual agreement as specified above at ¶ 33.

50.     In this regard, an Italian Court would also consider Penn's refusal consistent with the standard of good faith in case the amount expected to be funded in the Escrow by Pirito was of significant value while it would find the refusal contrary to the standard of good faith in case the amount owed to the Escrow was negligible.

51.     An Italian Court would also evaluate Penn World's actions in light of Pirito's letter dated March 23, 2005 in which he «rejects any suggestion that any outstanding amount is owed under Section 2(f)(vii) of the Agreement». An Italian Court would determine whether it was reasonable for Penn World to infer that Pirito was repudiating his obligations under the Agreement. Such repudiation, if determined, would be considered by an Italian Court to provide further evidence of Penn World's good faith.

<u>B.II.(*iii*)(*b*)      *Good Faith - Behaviour of Pirito*</u>

52.     As detailed at length above (*see* ¶¶ 30; 34), the standard of good faith enlarges the scope of the contractual obligations of the parties beyond the literal and written terms of the contract. As for Pirito, this means that even in case a Court doesn't consider fully satisfied the elements of the "*eccezione di inadempimento*" defense as to his main obligation to fund the Escrow, it should nonetheless add to the comparative evaluation of parties' behaviours the analysis of the further obligations of cooperation and protection deriving from the Agreement. The breach of these further obligations by Pirito may lead an Italian court to consider legitimate, under Art. 1460 I.C.C., Penn World's refusal to transfer the property.

53.     On the good faith element, an Italian Court would focus on the fact that the S.P.A. explicitly mentions the obligation of Pirito to repay the Net Worth Deficit as one guaranteed through the discipline of the Escrow (Sec. 2(e) S.P.A.) and further secured through the "outstanding amounts"-requirements of the Real Property Agreement (Sec. 2(f)(vii) S.P.A.). As a consequence, an Italian Court would give great weight in its good faith analysis to the alleged facts, if proven, that Pirito, by stalling (by obstruction or otherwise) in his duty to appoint the independent accountant pursuant to

Sec. 2(d) S.P.A., prevented the prompt determination of the net worth of MAE S.p.A., thus delaying the assessment of the disputed Net Worth Deficit until October 2007 [See Defendants, *Defenses and Counterclaims - August 17, 2009*, ¶¶ 92 ff.; *Brief - June 30, 2011*, p. 8-10].

54.    Additionally, an Italian Court would find a breach of Pirito's obligations to protect Penn World's interests and to cooperate with Penn World, if it were proven that, as alleged by the Defendants, Pirito by means of delays and trickery, on February 5, 2004, although aware that there was a substantial dispute over the Net Worth Deficit, obtained the release of € 1,000,000 from the Escrow account, basing his request on the literal prescription of Sec. 2(e) regarding the one-year anniversary withdrawal discipline [see Defendants, *Defenses and Counterclaims - August 17, 2009*, ¶¶ 116-119, p. 33]. An Italian Court may consider Pirito's removal of the funds from Escrow as a breach of his obligation to act in good faith regardless of whether the removal of funds was literally permitted by the contract.

55.    According to the standard set in the abovementioned case *Soc. Nuova Bellaria 80* vs. *Soc. Sporting Novi Pasturana e altri* (Cass. n. 387/1997), should an Italian Court find a good-faith breach perpetrated by Pirito with regard to the obligations of cooperation and protection of Penn World's interests (*see* ¶¶ 53-54), this would be a relevant element to justify, pursuant to Art. 1460 I.C.C., the refusal of Penn World to transfer the property, irrespectively of the findings related to the main Escrow obligation.

## C.    APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE S.C. "*DOLO*"

56.    In this Section, I will focus on the Italian rules governing the s.c. *dolo*, defined by Artt. 1439-1440 I.C.C. These provisions, similar in concept with the principles of Pennsylvania Law on

fraud[15], regulate cases in which one party has been deceived in his will to enter into a contract by a misrepresentation perpetrated by the other party.

### C.I. *ARTICLES 1439-1440 OF THE ITALIAN CIVIL CODE*

**57.** More specifically, under Italian Contract Law the basic elements of *dolo* may be summarized as follow:

    *i)*    The **misrepresentation** or deception by one party;

    *ii)*    The **justifiable reliance** of the recipient upon the misrepresentation;

    *iii)*    The **alteration of the recipient's consent**, causing:

        *a)* The execution of a contract that he/she would not otherwise have entered or

        *b)* The acceptance of less favourable contractual terms.

### C.I.(*i*) THE MISREPRESENTATION

**58.** It is widely accepted by Italian authorities (both scholars and Courts) that the element of misrepresentation consists not only of deceptions or false statements, but also of reticence, silence and nondisclosures (*e.g.* omissions) regarding facts that are material to the consideration of the contract [*see*, GAZZONI, *MANUALE DI DIRITTO PRIVATO*, Napoli: E.S.I. (11th ed., 2004), p. 944; ROPPO, *IL CONTRATTO*, cit., p. 761-766].

**59.** When evaluated alone, however, the mere reticence or silence is not relevant in terms of *dolo*: as recently, stated by Italian Supreme Court in <u>*Delliani* vs. *Lami* (Cass. n. 9253/2006)</u>, those behaviours can be qualified as misrepresentation under Artt. 1439-1440 I.C.C. only if they appear to

---

[15] I here refer to the principles and cases selected in *PENNSYLVANIA LAW ENCYCLOPEDIA*, vol. 25 (2nd ed., 2002), p. 471-498, defining "fraud":

§ 1    In General: «Fraud is practiced when there is a deception of another to his or her damage, brought about by a misrepresentation of facts or by silence when good faith requires expression» (p. 471);

§ 2    In its basic elements: «The essential elements of actionable fraud consist of, (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient would thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, (5) damage to the recipient as the proximate result» (p. 474).

be part of a complex conduct, deliberately planned, using trickery or malice, by one party in order to deceive the other.

**60.**     Accordingly, both in case of an utterance or reticence (*e.g.* omission), actionable *dolo* requires a fraudulent intent of the maker, and the recipient cannot object when the behaviour of the maker is exclusively based on a mistake [among Italian scholars, *see* BIANCA, *DIRITTO CIVILE*, vol. 3, Milano: Giuffrè (2000), p. 665][16]. In order to verify the existence of the fraudulent intent, Italian Courts base their analysis on the general conduct of the maker and give particular weight to those statements and behaviours that allowed him/her to cover or deny elements that would have been material for the recipient in evaluating the contract [*B.G. and Altro* (Cass. n. 30686/2012); GAZZONI, *MANUALE DI DIRITTO PRIVATO*, cit., p. 944].

### C.I.(*ii*)          THE JUSTIFIABLE RELIANCE

**61.**     Italian Courts consider justifiable reliance an independent element required by Artt. 1439-1440 I.C.C. This element requires that in order to be entitled to bring an action based on *dolo*, a deceived party must have reasonably relied on the other party's fraudulent representations or reticent behaviours: the rationale is that negligent reliance does not deserve judicial protection [*see* GAZZONI, *MANUALE DI DIRITTO PRIVATO*, cit., p. 943].

**62.**     Accordingly, as stated by Italian Supreme Court in *Airon s.r.l. c. Soliani* (Cass. n. 20792/2004, among other cases, the misrepresentation, be it perpetrated through fraudulent utterance or reticent behaviour (*e.g.* omission), is material and qualifies as *dolo* only if, given the

---

[16] In this regard, it must nonetheless be noted that Italian scholars are gradually accepting the idea that a negligent conduct perpetrated by one party can also entitle the other party to bring an action of *dolo*, demanding damages for so called pre-contractual liability (*see* ROPPO, *IL CONTRATTO*, cit., p. 766). This latter approach resembles the principle in Pennsylvania case law, where gross negligence or recklessness have been considered sufficient to give rise to an inference of fraud, as in *Raymond Rosen & Co. vs. Seidman & Seidman*, 48 Pa. D. & C.3d 411 (C.P. 1988) [as cited in *PENNSYLVANIA LAW ENCYCLOPEDIA*, cit., p. 487].

specific circumstances of the case, it would have been capable of deceiving a person of common diligence and prudence.

### C.I.*(iii)* THE CONSEQUENT ALTERATION OF THE CONSENT OF THE RECIPIENT

**63.** The misrepresentation must be the proximate cause of the alteration of the recipient's consent.

**64.** In this sense, it is necessary to distinguish between:

*a)* The s.c. ***dolo-vizio***: the deception suffered by the recipient during the negotiations has been the decisive factor causing the defrauded party to enter into a contract that he/she would not otherwise have executed at all;

*b)* The s.c. ***dolo-incidente***: the recipient would have entered into the agreement notwithstanding the misrepresentations but, if aware of them, he/she would have agreed on different terms. In other words, the deception has not completely affected the consent of the defrauded party, but has nonetheless been enough to make him/her enter into a contract at different (and less favourable) terms than those that he/she would otherwise have accepted.

### C.I.*(iii)(a)* *"Dolo-Vizio"*

**65.** According to the discipline of Art. 1439 I.C.C.[17], in case of *dolo-vizio* the contract may be deemed voidable, and the deceived party is entitled to damages.

**66.** As clarified by the Italian Supreme Court, in order to be entitled to avoid the contract and to collect damages pursuant to Art. 1439 I.C.C., a party must prove that the misrepresentation perpetrated by the other has caused an essential alteration of his/her understanding of the facts (and not a mere psychological influence or slight mistake), thus completely influencing his/her consent

---

[17] Art. 1439, par. 1, I.C.C. states: «**Fraud.** Fraud is cause for the annulment of the contract when the deception employed by one of the contracting parties was such that, without it, the other contracting party would have not have entered into the contract».

to enter into the agreement [*see*, among others cases, *De Muro* vs. *Lavacca* (Cass. sez. Unite n. 1955/1996)]. In such a circumstance, the computation of damages is based on the s.c. *interesse negativo* (*i.e.* reliance interest), corresponding to the damages suffered by the deceived party for having reasonably relied on the belief that he was entering into a "non vitiated" (valid) agreement. In other words, the compensation is aimed at putting him/her in the same position as if the contract had never been entered [*see*, ROPPO, *IL CONTRATTO*, cit., p. 770].

67.     Nonetheless, it is a well settled principle in Italian case law that the deceived party can recover the damages caused by the other party's fraudulent behaviour even without requesting to avoid the contract [*see*, among others cases, *R.G.* vs. *Banco di Sicilia S.p.A.* (Cass. n. 20260/2006)].

### C.I.(*iii*)(*b*)     *"Dolo-Incidente"*

68.     In case of *dolo-incidente*, Art. 1440 I.C.C. states that the contract is valid, but the defrauded party is entitled to damages[18].

69.     As clearly determined in Italian case law, the demand for damages is based on the condition that the misrepresentation of the other party, although not the decisive factor for the recipient in deciding to enter into the agreement, has nonetheless been capable of imposing on the recipient less favourable conditions than those that he/she would have otherwise accepted.

70.     In such a circumstance, the computation of damages of the deceived party covers, at least, "the lower benefit or the higher contractual costs" plus any further damage directly connected to the acceptance of the contractual terms resulting from the other party's fraudulent behaviour [*see*, Italian Supreme Court in *Benazzo* vs. *Ist. Bancario San Paolo Imi S.p.A.* (Cass. n. 19024/2005); and, among Italian scholars, ROPPO, *IL CONTRATTO*, cit., p. 770].

---

[18] Art. 1440 I.C.C. states in full: «**Incidental fraud.** If the deception was not such as to compel consent, the contract is valid, even though without the deception it would have included different terms; however, the contracting party in bad faith is liable for damages».

**71.**    In this subsection, I explain the elements required by Artt. 1439-1440 I.C.C. in the context of the Agreement devised by the Parties, with particular reference to the representations on, *inter alia*, the net worth; the accuracy of the financial statement; and the completeness and accuracy of the disclosures made by Pirito to the Defendants.

### C.II.(*i*)    The Misrepresentation

**72.**    Italian Judges would find the existence of a material misrepresentation, if they can determine as true the alleged fact that during the negotiation, throughout the second half of 2002 and early 2003, Pirito provided the Defendants with several documents and information (memorialized in the S.P.A., Sec. 4 and elsewhere), regarding the financial conditions of the purchased companies MAE S.p.A. and Maelux SA., that have subsequently proved to be significantly incorrect [as asserted by the <u>Defendants, *Defenses and Counterclaims - August 17, 2009, ¶¶ 21-45*</u>].

**73.**    In the assessment of the element of fraudulent intention, an Italian Court would give considerable weight to the alleged fact, if proven, that Pirito was in the position to have correct information about the financial conditions of the companies under acquisition being an experienced business man who owned virtually all the stock of MAE S.p.A. and Maelux SA and an officer and director of MAE S.p.A. [*see*, <u>Defendants, *Defenses and Counterclaims - August 17, 2009, ¶¶ 59-61* and *¶170*</u>].

**74.**    In this perspective, an Italian Court would certainly focus its analysis on the quantitative dimension of the disparity between Pirito's representations and the actual amount of the net worth as determined by the independent accountant. If proved, a gross disparity may lead an Italian Court to exclude (*i.e.* to reject the claim) that the representation of the maker is to be treated as a mere

justifiable mistake. A small disparity would lead a Court to accept that the representation was a justifiable mistake.

75. Furthermore, in evaluating the general conduct of Pirito in order to determine the presence of a fraudulent intent, it would be of great weight the alleged fact, if proven, that Pirito himself had created the € 514,000 debt from Maelux to Pirito [*see, Defenders, Defenses and Counterclaims - August 17, 2009, ¶¶ 59-61 and ¶ 80*]. This behaviour would be in contrast with the fact, if proven, that, during the negotiations, Pirito's lawyer expressly stated that, beside the Maelux's loan with Banca Popolare di Crema, Maelux had not other outstanding debt ([*see, Defendants, Defenses and Counterclaims - August 17, 2009, ¶¶ 59-61 and ¶¶ 73-77*].

### C.II.(*ii*)   THE JUSTIFIABLE RELIANCE

76. In evaluating the justifiable reliance element, an Italian Court would have to determine if Penn World and Penn Engineering have reasonably relied on the other party's fraudulent representations, acting with the required diligence and prudence. This "common diligence and prudence" standard is what an Italian Court uses to make this determination [Italian Supreme Court, *Airon s.r.l. c. Soliani* (Cass. n. 20792/2004)].

77. In this regard, together with the elements mentioned under ¶ C.II.(*i*), it would be extremely relevant to verify that the alleged false representations, provided by Pirito to the Defendants in order to evaluate the potential acquisition of the companies, were able to deceive a reasonable person. For example, the following types of facts, if proven, would be given weight:

*a)*   The representations have been repeatedly reiterated in several meetings held between the Parties during the relevant period, where, for example, Penn claims that Pirito's representatives specifically described MAE S.p.A. as a strong and solvent company, with successful products and operations, and Maelux SA as a mere "holding corporation" without any business activity;

*b)* Have been specifically integrated into the Agreement as accurate statements (Sec. 4 and elsewhere);

*c)* Gave rise to the Minimum Required Net Worth of the purchased companies as a focal element of the S.P.A., used to calculate various obligations assumed by Pirito under the Agreement.

[*see*, for example, Defendants, *Defenses and Counterclaims - August 17, 2009*, ¶¶ 35-39, 60].

### C.II.(*iii*)    THE CONSEQUENT ALTERATION OF THE CONSENT OF THE DEFENDANTS

**78.** In evaluating the impact of Pirito's alleged misrepresentations on the actual consent of Penn World and Penn Engineering in accepting the terms of the Agreement, for an Italian Court it would be extremely important to analyse the relevance of Pirito's representations during the negotiation.

**79.** In this regard, the following kind of facts, if proven, would of significant weight to an Italian Court:

«In evaluating the potential acquisition, determining the price, deciding whether or not to proceed, and drafting the provisions of the Agreement, Penn Engineering and Penn World relied upon, extensively analysed and used the above information and documentation provided by Pirito and represented by Pirito to be accurate» [Defendants, *Defenses and Counterclaims - August 17, 2009*, ¶ 41];

«Had they known that the above representations were materially inaccurate, Penn World would not have entered into the Agreement and Penn Engineering would not have funded the purchase of the stock» [Defendants, *Defenses and Counterclaims - August 17, 2009*, ¶ 45].

**80.** Should an Italian Court find all these elements (the misrepresentation; the justifiable reliance; the alteration of the consent) as present and true, it would consider the Defendants entitled to a legal action based on Art. 1439 I.C.C. (*dolo-vizio*, as defined above under ¶¶ 64(*a*); 65-67). Consequently, under Italian Contract Law the Defendants would have the alternative between

avoiding the contract and recovering reliance damages or keeping the contract in place and just claiming the payment of damages.

## D. APPLICABLE PRINCIPLES OF ITALIAN LAW REGARDING THE S.C. "PRE-CONTRACTUAL LIABILITY" AND THE DOCTRINE OF THE S.C. "*ERRORE*"

81. Under some conditions, Italian law entitles the recipient of an inaccurate or mistaken representation to collect damages or avoid the contract even when the Court is not able to find the element of fraudulent intent. In this Section, which is relevant only when the Court deciding the case is not able to find the element of fraudulent intent with regard to the maker's misrepresentation (*i.e.*, cases where there is no actionable *dolo* under Artt. 1439 and 1440 I.C.C., as described above at Section C), I will focus on the Italian Civil Code provisions regulating cases where an inaccurate or mistaken representation by the maker entitles the recipient to collect damages or to avoid the contract.

### D.I. *ARTICLES 1337, 2043, 1428, 1429 AND 1431 OF THE ITALIAN CIVIL CODE*

82. In particular, I will address the two potential legal consequences that Italian Contract Law imposes upon a negotiating party that, during the negotiation process, has provided to the other negotiating party inaccurate or mistaken information:

*i*) The s.c. "pre-contractual liability" of the maker of the inaccurate or mistaken representation, entitling the recipient to damages (Artt. 1337 and 2043 I.C.C.);

*ii*) The s.c. doctrine of "*errore*" (translatable as "mistake"), which entitles the recipient of the inaccurate or mistaken information to bring an action to avoid the contract (Artt. 1428,1429, par. 1, n. 2 and 1431 I.C.C.).

**83.**     According to Art. 1337 I.C.C.[19], during the negotiation process and the formation of a contract, parties are subject to the standard of good faith. In particular, negotiating parties are expected to abide by principles of fairness and probity and to protect the interest of the other negotiating party (*see* also ¶¶ 29-30). Furthermore, according to the general principle of Article 2043 I.C.C.[20], during the negotiations parties are expected to behave according to a standard of reasonable diligence [*see*, among others authorities, BIANCA, *DIRITTO CIVILE*, cit., p. 157].

**84.**     Therefore, in case of a breach of the standard of either good faith, or reasonable diligence during the negotiations, the breaching party incurs in the s.c. "pre-contractual liability" and is held liable for the damages suffered by the other party.

**85.**     Among the duties imposed upon the negotiating parties by Article 1337 I.C.C., it is included the s.c. "duty of correct information". As recently stated by Italian Supreme Court in *Benazzo* vs. *Ist. Bancario San Paolo Imi S.p.A.* (Cass. n. 19024/2005): within the scope of Art. 1337 I.C.C. are certainly included the duties to fairly negotiate; to refrain from artful behaviours or even from being reticent; *to provide the other negotiating party with any material information that is known or knowable by reasonable diligence* [emphasis added].

**86.**     Accordingly, in case one negotiating party, in bad faith or negligently, provides the other party with inaccurate or mistaken information, the recipient of the misleading representation is entitled to damages covering, at least, "the lower benefit or the higher contractual costs" related to the acceptance of contractual terms resulting from the other party's behaviour [*see*, Italian Supreme Court in *Benazzo* vs. *Ist. Bancario San Paolo Imi S.p.A.* (Cass. n. 19024/2005); *Fin.Com. Valori*

---

[19] Art. 1337 I.C.C. states in full: «**Negotiations and pre-contractual liability.** The parties, in the conduct of negotiations and the formation of the contract, shall conduct themselves according to good faith».

[20] Art. 2043 I.C.C. states in full «**Compensation for unlawful acts**. Any fraudulent, malicious or negligent act that causes an unjustified injury to another obliges the person who has committed the act to pay damages».

*s.r.l. in liquidazione e altri v. Ist. Bancario San Paolo Imi S.p.A.* (Cass., Sez. Unite, n. 26724/2007);

and, among Italian scholars, BIANCA, *DIRITTO CIVILE*, cit., p. 174].

**87.** It is a well settled principle under Italian Contract Case Law that the recipient of inaccurate

or mistaken information can bring an action to recover damages even in case the contract is valid or

the recipient has no interest in avoiding it [*see*, Italian Supreme Court in <u>*Benazzo* vs. *Ist. Bancario*</u>

<u>*San Paolo Imi S.p.A.* (Cass. n. 19024/2005)</u>; *Fin.Com. Valori s.r.l. in liquidazione e altri v. Ist.*

*Bancario San Paolo Imi S.p.A.* (Cass., Sez. Unite, n. 26724/2007)].

<u>D.I.(*ii*)</u>       <u>ARTT. 1428, 1429 AND 1431 OF THE I.C.C.: THE DOCTRINE OF "*ERRORE*"</u>

**88.** Another legal consequence that, under Italian Contract Law, may derive from inaccurate or

mistaken information, provided by one negotiating party to the other, is the possibility for the

recipient to avoid the contract in case his/her consent to the contract has been mislead by the

representation of the maker. This remedy applies when the recipient, because of the inaccurate or

mistaken representation of the maker, fall into error in evaluating the subject matter of the

agreement.

**89.** The s.c. doctrine of mistake, provides that when a negotiating party determines

himself/herself to enter into a contract because of a mistaken understanding of one of the essential

elements of the agreement, the contract is voidable by him/her (*i.e.* the mistaken party)[21] [*see*,

among others authorities, BIANCA, *DIRITTO CIVILE*, cit., p. 645-646].

**90.** In particular, in order for the mistaken party to be entitled to avoid the contract, the doctrine

of mistake requires that:

   *a*) The mistake is "material": had the mistaken party known of the mistake he/she would not

have entered into the agreement (Art. 1428; 1429, par. 1, n. 2, I.C.C.)[22];

---

[21] I refer here to the "mistaken party" as the recipient of the representation of the maker.
[22] Art. 1428 I.C.C. states in full: «**Relevance of mistake.** Mistake is cause for annulment of a contract when it is essential and recognizable by the other contracting party».

*b*) The mistake is "recognizable": the other party (*i.e.*, the non-mistaken party) knew or should have known, through reasonable diligence, of the mistake (Artt. 1428 and 1431 I.C.C.)[23];

*c*) The mistake is "essential": it rests on a "*qualità dell'oggetto*" [roughly translated as "quality of the object" or quality of the performance of the other party (Art. 1429, par. 1, n. 2, I.C.C.)][24].

91.    With specific regard to letter *c*), the Italian Supreme Court has made clear that, in a stock purchase agreement, the mistake of the buyer resting on the value of the shares, even in case it occurred because of the inaccurate or mistaken representation of the seller, is not sufficient to make a contract voidable. A well accepted principle of Italian Contract Law is that the economic value of the performance of the other party cannot be regarded as a "quality" of the performance itself and therefore the mistake in the evaluation of the convenience of the agreement cannot be treated as "essential" [*see I.r.co.s.s. s.r.l. in liquidazione v. Iritech S.p.A.* (Cass. n. 16031/2007)].

92.    However, when the seller has expressly guaranteed the value of the company, the Italian Supreme Court has stated that the doctrine of mistake is still applicable. In such a circumstance, since the value of the shares negotiated by the parties is strictly dependent on the guaranteed net worth of the company, the mistake of the buyer, who in the evaluation of the company has been mislead by the inaccurate or mistaken representation made by the seller, is considered "essential", and thus the element is met. Therefore, the mistaken party, in this hypothetical the buyer, is entitled not only to recover damages under Art. 1337 I.C.C., but also to avoid the contract under Artt. 1428 and 1429, par. 1, n. 2, I.C.C. [*see I.r.co.s.s. s.r.l. in liquidazione v. Iritech S.p.A.* (Cass. n. 16031/2007)].

---

[23] Art. 1431 I.C.C. states in full: «**Recognizable mistake.** A mistake is considered recognizable when, with respect to the content, the circumstances of the contract, or the quality of the contracting parties, it would have been detected by a person of normal diligence».

[24] Art. 1429, par. 1, n. 2, I.C.C. states: «**Essential mistake.** Mistake is essential: 2) when it concerns the identify of the object of the performance or *a quality of said object* which, according to common understanding or under the circumstances, should be considered *determinative of consent*» (emphasis added).

Disclosure of Expert Testimony under Federal Rules of Civil Procedure:

*In connection with my work on the present matter I have been paid Euro 250, 00 per hour.*

*I have not previously testified as an expert at trial or by deposition.*


I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct. Executed on November 14, 2012.

Signature

# EXHIBIT A

# GIACOMO ROJAS ELGUETA

Contact information: Corso Matteotti, 8, 2012 Milan, Italy (+39) 02 76319196 - g.rojas@rubinilaw.it

## EDUCATION

**UNIVERSITY OF PENNSYLVANIA**, Philadelphia, PA
*LL.M with Distinction.* Focus on: Corporate Law, Bankruptcy Law, International Commercial Arbitration. December 2008.
*S.J.D. Candidate.* Dissertation in Corporate Law advised by Prof. David Skeel: "Asset Partitioning: An Economic and Comparative Analysis between the Common Law and the Civil Law System". Expected May 2013.

**UNIVERSITÀ ROMA TRE**, Rome, Italy, June 2005.
*Doctoral Degree*, PhD equivalent.
• Dissertation in Civil Law: "Contract Freedom and the Limitations on Debtor Liability".
• Granted a Scholarship (Merit-based, first in the admission exam).

**UNIVERSITÀ ROMA TRE**, Rome, Italy, October 2001.
*J.D. equivalent* summa cum laude, Diploma di Laurea in Giurisprudenza.
• Research Assistant Scholarship to assist Prof. Andrea Zoppini (Merit-based), Academic Year 2000-2001.
• Scholarship provided by the Department of Legal Studies - Università Roma Tre (Merit-based), Academic Year 1999-2000.

## PROFESSIONAL EXPERIENCE

**STUDIO LEGALE RUBINI**, Milan, Italy, October 2009-present.
*Counsel.* Primarily involved in commercial and business litigation.

**STUDIO LEGALE PROF. AVV. ANDREA ZOPPINI**, Rome, Italy, November 2003-August 2007.
*Counsel* for Civil and Commercial Law. Responsible for legal opinions on trust instruments and estate planning; foundations bylaws; directors and officers liability; environmental law and corporate liability.

**STUDIO LEGALE AVV. SERGIO PICCAROZZI**, Rome, Italy, November 2001-October 2003.
*Trainee Lawyer.* Conducted legal research, and drafted briefs, agreements, memoranda in Civil Law. Drafted criminal complaints to defend clients in actions related to different types of crimes.

**ADMITTED TO THE ITALIAN BAR**, November 2004. **ADMITTED TO THE NEW YORK BAR**, October 2010.

## ACADEMIC ACTIVITY AND GOVERNMENT EXPERIENCE

**UNIVERSITÀ ROMA TRE**, Rome, Italy
*Tenured Assistant Professor* in Civil Law (Ricercatore confermato in Diritto Privato), January 2007-present.
*Courses Taught* Economic Analysis of Law 2005-present. Media Law 2007-present. Law and Literature 2007-2010.
*Teaching Assistant* to Prof. Andrea Zoppini and Prof. Vincenzo Zeno-Zencovich in Civil Law, Comparative Private Law, Family Law, 2002-2005.

**UNIVERSITY OF PENNSYLVANIA**, Philadelphia, PA
*LL.M Advisor* of the University of Pennsylvania Journal of International Law, January 2008-present.

**YALE LAW SCHOOL**, New Haven, USA
*Visiting Scholar*, Fall Term 2006. Academic Year 2003-2004.

• Invitation extended by Judge Guido Calabresi. Granted the "Mario Gasbarri" Scholarship provided by Alleanza Assicurazioni (leading Italian company in the Life Insurance market) (Merit-based).
*Editor* Yale Law and Policy Review, Fall Term, 2003.

**ITALIAN GOVERNMENT MINISTRY OF JUSTICE**, Rome, Italy, January 2012-October 2012.
*Member* of the Drafting Committee of the new Italian Consumer Bankruptcy Law.

**ITALIAN GOVERNMENT ECONOMICS AND FINANCIAL MINISTRY**, Rome, Italy, September 2006-December 2007.
*Member* of the Scientific Secretariat for the Reform of the First Part of the Italian Civil Code, which regulates Nonprofit Organizations.

**ITALIAN NATIONAL ASSOCIATION OF NOTARIES**, Rome, Italy, March 2006-November 2006.
*Member* of the Committee for the Study of the Italian Trust.

**GIUFFRÈ PUBLISHING HOUSE**, Rome, Italy, January 2006-July 2009.
*Member* of the Editorial Board and Co-author of the treatise "Civil Law" - edited by Prof. Nicolò Lipari and Prof. Pietro Rescigno.

**ALBERT-LUDVIGS-UNIVERSITÄT**, Freiburg, Germany
*Visiting Researcher*, Fall Term, 2005.

## FOREIGN LANGUAGE SKILLS

Italian (native), English (fluent), Spanish (fluent), German (basic).

# GIACOMO ROJAS ELGUETA

Contact information: Corso Matteotti, 8, 2012 Milan, Italy (+39) 02 76319196 - g.rojas@rubinilaw.it

## PUBLICATIONS*

### Books:

*Contract Freedom and the Limitations on Debtor Liability* - Milan published by Giuffrè, 2012.

*Regulation of Insurance Proceeds and Marital Property Law* – Naples, published by Jovene, 2007.

### Articles:

*Contract Freedom and Debtor Liability: New Perspectives*, in *Europa e Diritto Privato*, 2012, pp. 813-842.

*The Consumer Bankruptcy Discharge: Rereading the Common Law-Civil Law Relationship*, in *Banca, Borsa, Titoli di Credito*, 2012, pp. 310-350.

*Understanding Discovery in International Commercial Arbitration through 'Behavioral Law and Economics': A Journey Inside the Minds of Parties and Arbitrators*, in 16 *Harvard Negotiation Law Review*, 2011, pp. 165-191.

*Divergences and Convergences of Common Law and Civil Law Traditions on Asset Partitioning: A Functional Analysis*, in 12 *University of Pennsylvania Journal of Business Law*, 2010, pp. 517-554.

*Stories of Broken Authors and Literary Failures*, in *Materiali per una Storia della Cultura Giuridica*, 2007, pp. 289-312 (co-authored with Vincenzo Zeno-Zencovich).

*The Relation between Article 2645 ter and Article 2740 of the Italian Civil Code: an Economic Analysis of the New Italian Law of Trust*, in *Banca, Borsa e Titoli di Credito*, 2007, pp. 185-216 and in I *Quaderni della Fondazione Italiana per il Notariato*, Il Sole24ore, 2007, pp. 66-79.

*Evolution of Insurance Law and its Relation with Inheritance Law*, in *Rivista di Diritto Civile*, 2005, II, pp. 413-445.

*Marital Property Law and Insurance Contracts*, in *Rivista Trimestrale di Diritto e Procedura Civile*, 2005, pp. 1267-1284.

### Commentaries:

*Comment on Article. 2468 of the Italian Civil Code, The Community Property of Limited Liability Companies*, in *Commentario S.r.l. Dedicato a Giuseppe Portale*, edited by Dolemetta A. and Presti G., Milan, published by Giuffrè, 2011, p. 307-317 (co-authored with Andrea Zoppini).

*Comment on Articles 2447 bis-2447 decies of the Italian Civil Code (which regulate Corporate Asset Partitioning)* - in *Codice Civile Annotato*, edited by Perlingieri P., Naples-Bologna, published by Esi-Zanichelli, 2010, pp. 1996-2027(co-authored with Andrea Zoppini).

*Insurance Contract*, in *Manuale di Diritto Civile e Commerciale*, edited by Lipari N. and Rescigno P., Milan, published by Giuffrè, 2009.

*Comment on Articles 565-580 of the Italian Civil Code (Intestate Succession)* - in *Codice Civile Commentato*, edited by Alpa G. and Mariconda V., Milan, published by Ipsoa, 2nd ed., 2009, pp. 1519-1552.

*All the publications listed here are in Italian except for the articles in the Harvard Negotiation Law Review and in the University of Pennsylvania Journal of Business Law.*

## CONFERENCES

*Invited Speaker.* Conference on *Consumer Overindebtedness and Reorganization Plan. The Italian Regulation in the European Context.* Accountants Association of Rome, Rome, Italy, July 12, 2012.

*Invited Speaker.* Presentation on *The Consumer Bankruptcy Discharge: Rereading the Common Law-Civil Law Relationship.* 7th Annual Conference organized by Italian Society of Law and Economics, Turin, Italy, December 16-17, 2011.

*Invited Speaker.* Conference on *Personal Liability and Contract Freedom – Problems and Perspectives of Asset Protection.* Organized by Università di Foggia, Lucera, Italy, February 4, 2011.

*Invited Speaker.* Presentation on *Asset Partitioning: An Economic and Comparative Analysis between the Common Law and the Civil Law Systems.* Italian Association of Comparative Law - Biennial Meeting of Young Comparatists, Catania/Enna, Italy, May 28-29, 2010.

*Invited Speaker.* Presentation on *Loans' Security Interests and Risk Management.* Paradigma Association, Milan, Italy, March 22-24, 2010.

*Invited Speaker.* Presentation on *Consumer Bankruptcy.* Milan Chamber of Commerce, Milan, Italy, December 14, 2009.

*Invited Speaker.* Presentation on *Asset Partitioning: An Economic and Comparative Analysis between the Common Law and the Civil Law Systems.* Canadian Law and Economics Association Annual Conference, Toronto, Canada, October 2-3, 2009.

*Invited Speaker.* Presentation on *Understanding Discovery in International Commercial Arbitration through 'Behavioral Law and Economics': A Journey Inside the Minds of Parties and Arbitrators.* 26th Annual Conference organized by the European Association of Law and Economics, Rome, Italy, September 17-19, 2009.

*Invited Speaker.* Presentation on *Asset Partitioning: An Economic and Comparative Analysis between the Common Law and the Civil Law Systems.* Roma, Siena, Tel Aviv, Toronto Law & Economics International Workshop. Rome, Italy, July 22-23, 2009.

*Invited Speaker.* Presentation on *Asset Partitioning: An Economic and Comparative Analysis between the Common Law and the Civil Law Systems.* 4th Annual Conference organized by Italian Society of Law and Economics, Bologna, Italy, November 7-8, 2008.

*Invited Speaker.* Conference on *Systematic Profiles and Cost-Benefit Analysis of Asset Partitioning.* Organized by Università di Sassari, Sassari, Italy, July 12, 2007.

*Invited Speaker.* Conference on *Bankruptcy and Literature - William Shakespeare, Daniel Defoe and the Historical Evolution of the English Bankruptcy.* Organized by Università di Roma Tre, Rome, Italy, November 30, 2006.

*Invited Speaker.* Conference on the *Italian Law of Trust.* Organized by the Italian National Association of Notaries, Rimini, Italy, July 1, 2006.

*Invited Speaker.* Conference on *Corporate Asset Partitioning and Limitations on Debtor Liability.* Organized by Università di Roma Tre, Rome, Italy, January 25, 2006.