IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CATALDO PIRITO                 :     CIVIL ACTION
                               :
        v.                     :
                               :
PENN ENGINEERING WORLD         :
HOLDINGS, et al.               :     NO. 09-2396

MEMORANDUM

Dalzell, J.                                    May 16, 2013

        Before us in this protracted international commercial

dispute are cross-motions for summary judgment by plaintiff and

counterclaim defendant Cataldo Pirito ("Pirito") and defendants

and counterclaim plaintiffs Penn Engineering & Manufacturing

Corp. ("Penn Engineering") and Penn Engineering World Holdings

("Penn World").  After initial consideration of the submissions

we ordered supplemental briefing on the effect of the judgment

of the Milan (Italy) Court of Appeals that rejected Pirito's

appeals and confirmed the Italian arbitral awards of February 13

and September 18, 2009.  We also consider both Penn entities'

motion for costs.

        As we described in our December 22, 2011 Memorandum

(the "Memorandum"), this case arises out of a Stock Purchase

Agreement ("SPA" or "the Agreement") executed in February 2003[1]
pursuant to which Penn World purchased the capital stock of
Maelux SA, a Luxembourg corporation that owned all the capital
stock of M.A.E. S.p.A. ("M.A.E."), an Italian manufacturer and
merchant of electric motors.  *Pirito v. Penn Engineering World
Holdings*, 833 F. Supp. 2d 455, 460 (E.D. Pa. 2011); Def.
Counterclaim ¶ 3. In his complaint, Pirito alleges that Penn
World -- and through its Guarantee Penn Engineering[2] -- breached

---

[1] Though the SPA is dated January 23, 2003, both parties refer to
February 5, 2004 as the first anniversary of the closing date,
see Br. in Supp. of Pl.'s MSJ at 15 (hereinafter "Pl. MSJ"); Br.
in Supp. of Def.'s MSJ (hereinafter "Def. MSJ") at 15 which
references the closing date as February 5, 2003.  Because the
parties seem to agree that the closing took place on February 5,
2003, we will accept that date as the closing date.

[2] When Penn World and Pirito entered into the Agreement, Penn
Engineering executed a Guarantee, providing that

> Penn Engineering & Manufacturing Corp.
> ("Parent") irrevocably guarantees each and
> every representation, warranty, covenant,
> agreement and other obligation of the Buyer,
> and/or any of its permitted assigns (and
> where any such representation or warranty is
> made to the knowledge of the Buyer, such
> representation or warranty shall be deemed
> made to the knowledge of Parent), and the
> full and timely performance of their
> respective obligations under the provisions
> of the foregoing Agreement.

Def. MSJ Ex. 1 at 45 ("Guarantee").  In our Memorandum we found
that Penn Engineering was not a party to the contract, *Pirito*,
833 F. Supp. 2d at 467, and Penn World asserts, and Pirito does
not dispute, that "Pirito cannot prevail on his claim for

§ 2(f) of the SPA by making a demand for the Real Property Payment Amount that was not based on the contract's formula and then failed to sell him the property.  Comp. ¶¶ 52-64.

The Penn entities counterclaimed in four counts: (I) Fraud, (II) Breach and Lapse of Option to Purchase Real Property, (III) Enforcement of the Determination of the Independent Public Accountant, and (IV) Breach of Contract. Def. Ans. ¶¶ 168 - 95.  In our Memorandum, we granted Penn World's motion to confirm the September 18, 2009 Final Award, Pirito, 833 F. Supp. 2d at 470, and because this granted Penn World the relief it sought in Count III of its counterclaims, our determination mooted that count.  Here, Penn World moves for summary judgment on Count II of its counterclaims, Breach (§ 2(d) of the SPA) and Lapse of Option (§ 2(f) of the SPA).

For the reasons we here explain at length, we hold that Penn World did not breach § 2(f) of the SPA, and we will thus grant the Penn entities' motion for summary judgment on Pirito's claims and deny Pirito's motion for summary judgment on cognate claims.  We hold that Pirito breached § 2(d) of the SPA

---

summary judgment on Count II of the Complaint against Penn Engineering, the Guarantor, unless he prevails on his claims against Penn World on Count I of the Complaint."  Def. Resp. in Opp. to Pl. MSJ at 29.  See also Pl. MSJ at 30 ("Penn Engineering guaranteed Penn World's performance under the SPA"). We thus focus our inquiry now on Penn World's liability.

and that the option has lapsed, and so we will grant the Penn

entities' motion for summary judgment with regard to Count II of

the Counterclaims and in doing so we deny Pirito's motion for

summary judgment on his corollary contentions.  We decline to

enter the money judgment Penn World seeks on Count II of its

counterclaims.  We will dismiss Counts I and IV without

prejudice as Penn World requests, and so will deny Pirito's

motion for summary judgment with regard to these claims as moot.


I.   <u>Factual and Procedural Background</u>

          In our Memorandum, we described the formation of the

Agreement and recounted the (1) provision for determining the

consolidated net worth of Maelux SA after the closing (contained

in § 2(d)), (2) Real Property Agreement (contained in § 2(f)),

(3) choice of law clause selecting Italian law (contained in §

13(m)), and (4) arbitration provision (also in § 13(m)).  <u>See</u>

<u>Pirito</u>, 833 F. Supp. 2d at 460-62.  We also rehearsed at length

the factual history regarding Penn World's allegations as to

Pirito's misrepresentations and failure to comply with § 2(d), §

3, and § 4 of the Agreement, the first and second arbitration

proceedings and awards, and Pirito's appeal.  <u>Id.</u> at 463-66.  We

incorporate that information by reference, and we will now

describe the facts relevant to the instant motions.

4

A.   <u>The Net Worth Deficit Dispute</u>

Our Memorandum also considered the SPA's mechanism for determining the consolidated net worth of Maelux SA at closing, whereby the parties would engage Ernst & Young LLP to determine the consolidated net worth of Maelux, including M.A.E.[3], on the day of closing, and if Pirito disputed that finding he would notify Penn World of the dispute and the parties would negotiate in good faith for fifteen days.  If they were unable to resolve the dispute, the parties would refer the matter to a mutually-agreeable independent public accountant, and, if they could not agree on such an accountant, they would each designate an accountant, and the accountants would together choose an independent public accountant to determine the Net Worth. <u>Pirito</u>, 833 F. Supp. 2d at 461.  Next,

> [i]f and to the extent that the Net Worth of the Company reflected on the Closing Statement as finally determined ("Net Worth at Closing") shall be an amount less than €815,821 ("Minimum Required Net Worth"): (i) the Purchase Price shall be retroactively and immediately reduced by an amount equal to the amount ("Net Worth Deficit") by which the Net Worth at Closing is less than the Minimum Required Net Worth, and (ii) an

---

[3] The parties agree that the Net Worth here means the Net Worth of both Maelux and M.A.E., <u>see</u> Def. MSJ at 16 n.11, citing Letter of Pirito's counsel, Def. MSJ Ex. 21, wherein Pirito's counsel defines "Net Worth" as "Total Assets minus total liabilities of Maelux and MAE".

> amount equal to the Net Worth Deficit shall
> become immediately due and payable to the
> Buyer from the Seller, such amount being
> payable first from the Escrow, and, if in
> excess of the Escrow, then by the Seller.

SPA, Def. MSJ Ex. 1, at § 2(d).

Section 2(e) contains the escrow agreement, and it provides that "[a]t Closing, the Seller, the Buyer and Union Bank of Switzerland (the 'Escrow Agent') shall enter into a mutually satisfactory Escrow Agreement . . . in order to secure the Buyer with respect to (i) any repayment of the Net Worth Deficit as further provided in Section 2(d) . . . ." § 2(e). The escrow agreement further provided that

> The amount of the Escrow shall initially be
> €2.0 million, which shall reduce to €1.0
> million on the one-year anniversary of the
> Closing Date, €500 thousand on the two-year
> anniversary of the Closing Date, €400
> thousand on the three-year anniversary of
> the Closing Date, €300 thousand on the four-
> year anniversary of the Closing Date and
> €200 thousand on the five-year anniversary
> of the Closing Date.  Notwithstanding the
> preceding sentence, (i) the applicable
> required amount of the Escrow provided for
> in this Section 2(e) shall not at any time
> be reduced below the aggregate of all then
> contested amounts under the Escrow Agreement
> and (ii) the amount of funds available to
> the Buyer through the Escrow shall not be
> less than €400 thousand on the three-year
> anniversary of the Closing Date, excluding
> then contested amounts under the Escrow
> Agreement, even if such requirement results

> in the Seller being required to transfer
> additional funds into the Escrow.

<u>Id.</u>

The parties agree that in July of 2003 Penn World sent Pirito the Ernst & Young report which found the Net Worth to be negative €442,000, which would result in a Net Worth Deficit of about €1,250,000.  Pl. MSJ at 14; Def. MSJ at 16.  Pirito informed Penn World that he disputed this finding, and the parties thereafter negotiated the Net Worth Deficit for several months.  <u>Id.</u>

The parties disagree about whether they came to a substantive agreement about the Net Worth Deficit: Penn World maintains that it made a revised offer on October 29, 2003, and in December of that year Pirito's lawyer told Penn World Pirito accepted that offer with one condition to which Penn World agreed.  Def. MSJ at 17.  According to Penn World, in order to avoid arbitration, "[a]ll that had to be done was for the parties to carry [the agreement] out by sending the necessary Joint Written instructions to the Escrow Agent, whereby some funds would be wired to Penn World and all the rest would stay in escrow", <u>id.</u>, but as the first anniversary of the closing date approached, Pirito "started playing games".  <u>Id.</u>  Penn

World avers that on February 4, 2004 -- the day before the one-year anniversary -- Pirito's lawyer informed Penn World that Pirito was in Brazil and would not sign the instructions to the Escrow Agent, but would instead "clarify and finalize" the agreement "in about a week".  Id. at 18; Declaration of Richard Davies, Def. MSJ Ex. 41 ¶ 20.  Penn World, fearing the Escrow Agent would automatically release the funds on February 5, 2004 if it had not yet initiated arbitration proceedings, "notified the Escrow Agent of its intent to file for arbitration in an effort to prevent the escrow release", Def. MSJ at 18; Cohen Dep., Def. MSJ Ex. 4, at 235:2-10.

According to Pirito, "[t]he parties negotiated the calculation of the [Net Worth Deficit] for several months," but "by January 27, 2004, the parties still had not reached an agreement", Br. in Supp. of Pl.'s MSJ (hereinafter "Pl. MSJ") at 15.

On February 5, 2004, Pirito's lawyer sent a letter informing the Escrow Agent that "no arbitration has being [sic] initiated between the Purchaser and the Seller."  Def. MSJ Ex. 42.  That day the Escrow Agent released €1 million to Pirito. Pl. MSJ at 15-16; Def. MSJ at 18.

8

On January 26, 2005, Penn World filed a Request for
Arbitration seeking reimbursement for the Net Worth Deficit,
damages, and a binding interpretation regarding the § 2(e)
provision in the SPA by which Penn World had the right to
receive from escrow "the amount, if any, by which the Reduction
Threshold (as defined in Appendix B [to the SPA]) exceeds
positive amounts resulting from the Earn-Out calculation not
paid to [Pirito] as a result of the Reduction Threshold (the
'Reduction Amount')[4]".   Penn World claims this would result in a
total award of about €2.9 million.  Def. MSJ at 8.

### B.   The Real Property Agreement Dispute

On February 22, 2005, Pirito exercised the "call
option" by giving Penn World notice of his intent to buy back
land and real property (collectively the "real property") that
M.A.E. owned in Offanengo, Italy.  See SPA, Def. MSJ Ex. 1 at 4.

The SPA provided a process -- contained in § 2(f) and
titled the "Real Property Agreement" ("RPA") -- by which Pirito
could buy the real property back from Penn World.  The questions
of whether Penn World had an obligation to sell the real
property to Pirito under the RPA and whether Penn World breached

---

[4] According to § 2(e), the escrow provision of the SPA, "[t]o the
extent that funds are not available under the Escrow to pay the
Reduction Amount, such amount shall be promptly paid by the
Seller to the Buyer."

that obligation is at the heart of both summary judgment

motions.  We will therefore recount in detail the terms of the

agreement and the parties' actions regarding the purchase of the

real property.

> The RPA provides,
>
> > Upon delivery of a written notice delivered
> > to the Seller not less than 60 days prior to
> > the third anniversary of the Closing Date,
> > the Seller shall be obligated to purchase
> > the Real Property from the Company and the
> > Buyer shall be obligated to cause the
> > Company to sell the Real Property to the
> > Seller on the third anniversary of the
> > Closing Date.

§ 2(f)(i).

The parties do not dispute that on February 22, 2005,

Pirito sent a letter to Penn World giving notice of his intent

to purchase the real property pursuant to § 2(f).  See Pl. MSJ

at 16; February 22, 2005 Letter, Pl. MSJ Ex. 78.  Because the

closing happened on February 5, 2003, this notice was timely

under the SPA.

The SPA provides a formula for determining the Real

Property Payment Amount.  If Pirito exercised his option to buy

the property,

> on the third anniversary of the Closing
> Date, the Seller w[ould] (X) either pay off
> or assume the outstanding debt service
> obligation for the Real Property and (Y) pay
> the Company an amount equal to (A) the

amount by which the <u>debt service obligations</u>
<u>paid</u> by the Company with respect to the Real
Property during the three-year period
exceeded €1.02 million plus (B) the amount
of real estate taxes paid with respect to
the Real Property over the three-year period
plus (C) the present value, determined as of
the date of the closing of the sale of the
Real Property using the Applicable Rate, of
the amount of any taxes . . . determined at
the time of the sale of the Real Property .
. . plus (D) the aggregate amount of any
costs and expenses incurred by the Company
during the three-year period to remediate
any asbestos contamination.

§ 2(f)(iii) (emphasis added).

The RPA continues, "To effectuate such purchase,
promptly upon agreement on the Real Property Payment Amount to
be paid to the Company pursuant to subsection (iii), the Seller
and the Company shall enter into an agreement with respect to
the sale of the Real Property . . . ." § 2(f)(i).

The RPA provides a specific process for reaching an
agreement as to these amounts.  Upon delivery of Pirito's notice
that he was exercising his option, Penn World was to "compute
the amount owed . . . pursuant to clause (Y) . . . and provide
notice of such computation to [Pirito]." § 2(f)(iii).  The
parties agree that on March 17, 2005 Penn World's lawyer,
Frederick W. Dreher, Esq., wrote to Pirito setting forth the
Real Property Payment Amount Penn World had calculated.  Def.

11

MSJ at 9; Def. MSJ Ex. 9; Pl. MSJ at 16.  Penn World proposed a Real Property Payment Amount of €3,768,090, plus the present value of any taxes incurred by M.A.E. as a result of selling the real property.  Def. MSJ Ex. 9.  The €3,768,090 included €716,599 in debt service obligations under § 2(f)(iii)(Y)(A), €56,982 in real estate taxes under § 2(f)(iii)(Y)(B), and €2,994,509, which Penn World alleged was "the outstanding amounts currently owed by [Pirito] to [Penn World] with respect to the Net Worth Deficit . . . the Reduction Amount . . . Slow Moving Inventory and Obsolete Inventory . . . and [Pirito's] breach of the representation and warranty in Section 4(d) . . . ."  Id.

The RPA provides that "[w]ithin fifteen business days, [Pirito] shall provide to [Penn World] a written response . . . in which [Pirito] shall (i) agree that the proposed Real Property Payment Amount is accurate or (ii) disagree that the proposed Real Property Payment Amount is accurate."  § 2(f)(iii).  Given the tenor of the parties' interactions by this point, it comes as no surprise that Pirito did not agree with Penn World's proposed Real Property Payment Amount; Pirito's lawyer timely informed Penn World of Pirito's objection in a March 23, 2005 letter.  Def. MSJ at 9; Pl. MSJ at 16; Def. MSJ Ex. 10.

According to the RPA, "If [Pirito] provides a Response Notice indicating that the Real Property Payment Amount is inaccurate, then the Parties shall negotiate such matter in good faith for fifteen business days." § 2(f)(iii).  The RPA then provides that

> If no resolution can be reached by the end of [the negotiation] period, the decision as to the proper Real Property Payment Amount as computed in accordance with clause (Y) <u>shall be submitted upon request of either or both Parties to a sole arbitrator</u> to be appointed by the President of the National and International Arbitration of Milan . . .

§ 2(f)(iii) (emphasis added).  The parties disagree about whether they had reached a resolution by the end of the negotiation period.

Penn World contends that the parties never reached an agreement as to the Real Property Payment Amount.  In the March 23, 2005 letter informing Penn World of Pirito's objections, Pirito's lawyers wrote "Our client reserves his position with regard to the amounts claimed by way of debt service obligations and real estate taxes and rejects any suggestion that any outstanding amount is owed under Section 2(f)(vii) of the Agreement".  Pirito's counsel further explained that because "the amounts claimed by [Penn World] as 'outstanding amounts' are subject to ongoing arbitration proceedings and fully

13

disputed," Pirito "takes the view that the inclusion of these amounts in the Real Property Payment Amount is an indication of bad faith on [Penn World]'s part."  March 23, 2005 Letter, Def. MSJ Ex. 10.  Penn World's lawyer Dreher responded on April 28, 2005, objecting to the allegation of bad faith on Penn World's part and arguing:

> we have reviewed the Agreement and disagree
> with your assessment that there are not
> "outstanding amounts" owed under the
> Agreement.  The purpose of the arbitration,
> in our client's view, is to cause Mr. Pirito
> to pay outstanding amounts that he has
> unreasonably refused to pay to date . . . as
> provided by the Agreement, there would be a
> reduction in the proposed Real Property
> Payment Amount to the extent a portion of
> the outstanding amounts remain contested
> under the Escrow Agreement.  The amount
> contested under the Escrow Agreement at the
> time of sale cannot be determined at this
> time.

April 28, 2005 Letter; Def. MSJ Ex. 11.  Dreher then reminded Pirito's counsel that Pirito was obligated to ensure that "the Escrow holds not less than €400,000 on the date of closing of the sale of the Real Property", excluding "any amounts that may be contested under the Escrow Agreement at that time".  Id. Dreher noted that Penn World "otherwise reiterates its calculation of the Real Property Payment Amount as described in our March 17, 2005 letter" and informed Pirito's counsel that

the April 28 letter triggered the fifteen day negotiation period under § 2(f)(iii).

On May 11, 2005, Pirito's counsel responded that "the inclusion of the 'outstanding amounts' in the Real Property Calculation will make that calculation unacceptable to our client, leading to a dispute in relation to the Real Property Calculation."  May 11, 2005 Letter, Def. MSJ Ex. 12.

Six days later, Dreher sent a letter to Pirito's lawyers confirming that the negotiation period had ended and that Penn World "concur[ed] with [Pirito's lawyers'] assessment that there is a dispute with respect the the [sic] calculation of the Real Property Payment Amount."  May 17, 2005 Letter, Def. MSJ Ex. 43.

Penn World contends that in light of these discussions the parties never reached an agreement as to the Real Property Payment Amount.  Def. MSJ at 9.  Pirito disagrees and asserts that "the parties did not dispute the calculation of the Real Property Payment Amount and did not have anything to arbitrate under Section 2(f)(iii)."  Pl. Resp. in Opp. at 6.  Pirito does not cite any evidence in the record contemporaneous with the negotiation period that could fairly be read as constituting Pirito's agreement with Penn World's calculations.  Instead, he

15

justifies his argument that the parties reached a resolution as to the Real Property Payment Amount by drawing a distinction between disputes over outstanding amounts owed pursuant to § 2(f)(vii) on the one hand, and real estate tax and debt service amounts owed pursuant to § 2(f)(iii) on the other, with only the latter matters subject to the arbitration provision.  Pirito claims that he agreed to Penn World's calculations with regard to amounts owed under § 2(f)(iii), and in support he points to his recent deposition testimony in which he said that he understood the letter stating that he "reserve[d] his position" as to the debt service and the real estate tax calculations to mean that he agreed with those calculations.  Pirito September 26, 2012 Dep. at 56:5-56:6; Pl. MSJ Ex. 1.

We will address below whether this construction creates a genuine issue of material fact as to whether "no resolution [was] reached by the end of [the negotiation] period", but we note at this juncture that it is undisputed that neither party requested arbitration to resolve the proper Real Property Payment Amount under 2(f)(iii).  See, e.g., Pl. Resp. in Opp. at 7; Def. MSJ at 11.

II.  Motions for Summary Judgment

     A.   Standard of Review

          A party moving for summary judgment bears the initial
burden of informing the district court of the basis for its
argument that there is no genuine issue of material fact by
"identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together
with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact", Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986).

          If the moving party meets this initial burden, Fed. R.
Civ. P. 56 then obliges "the nonmoving party to go beyond the
pleadings and by her own affidavits, or by the 'depositions,
answers to interrogatories, and admissions on file,' designate
'specific facts showing that there is a genuine issue for
trial.'"  Id. at 324.

          A factual dispute is genuine

          [I]f the evidence is such that a reasonable
          jury could return a verdict for the
          nonmoving party. . . . The mere existence of
          a scintilla of evidence in support of the
          plaintiff's position will be insufficient;
          there must be evidence on which the jury
          could reasonably find for the plaintiff.

17

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).
A fact is "material" if it "might affect the outcome of the suit
under the governing law". Id. at 248.

We "must draw all reasonable inferences in favor of
the nonmoving party, and [we] may not make credibility
determinations or weigh the evidence." Reeves v. Sanderson
Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), cited in Amour
v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001)).

B.   Governing Law

As we noted in our earlier Memorandum, § 13(h) of the
SPA provides that Italian law will govern the Agreement "without
giving effect to any choice or conflict of law provisions or
rules that would cause the application of the laws of any
jurisdiction other than Italy." § 13(h).

According to Fed. R. Civ. P. 44.1, "[i]n determining
foreign law, the court may consider any relevant material or
source, including testimony, whether or not submitted by a party
or admissible under the Federal Rules of Evidence." Thus, a
court applying foreign law may "rely on its own research and any
submissions from the parties when considering foreign law" and
it "may use an expert report to determine substantive foreign
law." HFGL Ltd. v. Alex Lyon & Son Sales Managers and

18

Auctioneers, Inc., 264 F.R.D. 146, 148 (E.D. Pa. 2009) (internal quotations omitted).

As our Court of Appeals has explained, parties wishing to invoke foreign law "carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case." Bel-Ray Co., Inc. v. Chemrite (PTY) Ltd., 181 F.3d 435, 440 (3d Cir. 1999).  Moreover, "[w]hen parties fail to satisfy either burden the court will ordinarily apply the forum's law." Id. at 441 (citing Walter v. Netherlands Mead N.V., 514 F.2d 1130, 1137 n.14 (3d Cir. 1975)). See also Banco de Credito Indus. v. Tesoreria Gen., 990 F.2d 827, 836 (5th Cir. 1993) ("When the parties have failed to conclusively establish foreign law, a court is entitled to look to its own forum's law in order to fill in any gaps").

The parties agree that Italian law governs the breach of contract dispute here, see Def. MSJ at 35-36; Pl. MSJ at 22. Both have submitted expert's briefs to assist us in determining the exact contours of that law.

### C.   Penn World's Motion for Summary Judgment

Penn World seeks summary judgment for the Penn entities on Pirito's claim for breach of contract under the Real

Property Agreement and on Count II of Penn World's Counterclaim, which concerns Pirito's alleged breach of the Real Property Agreement.  Def. MSJ at 1.

Penn World asks that if we grant summary judgment for it on Pirito's claims and on Count II of Penn World's counterclaim, "the remaining counterclaims be dismissed without prejudice to reassertion if Pirito brings additional legal proceedings or if the pending appeals of the Italian arbitrations result in further proceedings."  Def. MSJ at 54-55.

### 1.   Penn World's Motion for Summary Judgment on Pirito's Claims

Penn World argues that it is entitled to summary judgment because Pirito's actions were insufficient to perfect a contractual right to buy the real property under § 2(f).

### a.   The Nature of the Contract

On a motion for summary judgment we are to decide matters of law.  See, e.g., Gould v. American-Hawaiian S. S. Co., 535 F.2d 761, 771 (3d Cir. 1976).  Neither party contends that the contract was ambiguous, and where "the written terms of the contract are not ambiguous and can only be read one way, the court will interpret the contract as a matter of law."  Hullett

v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d
Cir. 1994).

       The Real Property Agreement purports to grant an
option because it provides that upon Pirito's proper notice he
"shall be obligated to purchase the Real Property from the
Company" and Penn World "shall be obligated to cause the Company
to sell the Real Property".  Def. MSJ Ex. 1 at § 2(f)(i).  Penn
World contends that under Italian law where a contract that
purports to grant an option leaves undefined an essential term
such as price, the optionee's notice of exercise of that option
binds the parties "to discharge in good faith the further
obligations necessary to define those essential terms and create
a final contract", Def. MSJ at 38, but it does not create an
automatic right to buy the real property.  Such a right would be
created, Penn World argues, only if "the original agreement
[had] specified all essential elements of the final contract,
such that upon acceptance the rights and obligations are firmly
set without anything further being required."  Id.  Here,
according to Penn World, where the contract did not define the
price, Pirito's notice of his exercise of the option bound the
parties to comply in good faith with the procedure for
establishing the Real Property Payment Amount set forth in §

2(f).  Id. at 39.  Because the parties disputed the calculus of
the Real Property Payment Amount, Penn World contends, §
2(f)(iii) required either party who wished to complete the
transaction to submit the determination of the amount to
arbitration -- which Pirito failed to do.  Penn World argues
that Pirito thus never perfected his right under the contract to
purchase the real property, nor did Penn World's obligation to
cause M.A.E. to sell it ever arise.  Id.

In support of this argument, Penn World relies on the
expert testimony of Giacomo Rojas Elgueta ("Rojas") regarding
Italian law.  As Rojas explains, the Italian legal system is a
civil law system, and the Italian Civil Code regulates Italian
Contract Law.  Rojas Aff. at 7-8.

Article 1331 of the Italian Civil Code governs option
contracts, and it provides that "[w]hen the parties agree that
one of them is to remain bound by his declaration and that the
other has the power to accept or not, the declaration of the
first is considered an irrevocable offer . . . ."[5]  Rojas Aff.
Appx. 1 at 25.

According to Rojas, Italian law distinguishes between
a "binding option" -- or one that specifies all essential

---

[5] Neither party contests the translations into English from the
original Italian.

elements of the final contract -- and an "incomplete option" -- a bilateral agreement that lacks some essential elements and whose exercise binds the parties "to fulfill the reciprocal obligations and procedures agreed upon in order to cause the conclusion (finalization) of the final contract and to make it valid and binding." Rojas Aff. at 10. Rojas finds support for this distinction in jurisprudence of the Italian Supreme Court, n. 18,201, Sept. 10, 2001, Ghibellini v. Borgesi, in which that Court found that a "declaration rendered binding by an option agreement for one of the parties (art. 1331 Civil Code) must contain all of the essential elements of the contract, without the need of further agreements, in order to allow the execution of the contract when the other party manifests its acceptance". Rojas Aff. Appx. 1 at 10.

Rojas also cites Supreme Court, n. 10,777, Oct. 29, 1993, Soc. Ombrone v. Michienzi[6], in which the Italian Supreme Court explained that an option agreement under Art. 1331 "must contain all the essential elements of the contract to be executed in order to be perfected at the time and due to the

---

[6]As Rojas explains, the Ufficio del Massimario, and office of the Corte di Cassazione -- the Italian Supreme Court -- publishes excerpts of its opinions, referred to individually as Massima. These Massime set forth the Court's holdings, and Rojas avers that Italian lawyers and judges routinely cite them rather than full opinions. As such, Rojas relies on them to supply the content of Italian courts' decisions here.

assent of the other party, without the need for further stipulations", id. at 14.  If a contract does not contain all the essential elements, "it is assumed to be a mere preparatory agreement intended to be inserted in the formation of a future contract with the effect of fixing only the elements already agreed".  Id.  Thus, according to Rojas, in Michienzi, which concerned a real property contract, the Italian Supreme Court found that where the agreement did not specify all essential terms -- there, the terms of payment due the buyer -- "the explicit acceptance by the optionee is not sufficient to perfect the transfer of the property, but the acceptance is at most capable of binding the parties to discharge the further duties that have been arranged in contemplation of the conclusion (finalization) of the future contract."  Rojas Aff. at 10.

Pirito's Italian law expert, Romano Vaccarella, does not appear to dispute that there may be a distinction between option contracts that contain all essential terms and indefinite options which do not, but he argues for an expanded understanding of what it means for a contract to contain all essential terms.  According to Vaccarella, a contract constitutes a binding option "not only when the sale price is already determined in the option, but even when it is

determinable in accordance with certain criteria, references, or pre-established parameters" so long as "the subsequent parties' activity is merely limited to recognizing or implementing such criteria, references or parameters."  Vaccarella Aff. at 6. Vaccarella relies on Article 1346 of the Italian Civil Code for this proposition, which provides that the object, or purpose, of a contract must be "possible, lawful, determined or determinable."  Id.

Pirito thus argues that this contract was a binding option because "all of the terms of the option are set forth in Section 2(f)(iii)."  Pl. Resp. in Opp. at 4.  Pirito argues that § 2(f)(iii) contained the Real Property Payment Amount because "[a]ll of the essential elements necessary to determine the option are specified" in that

> the Real Property Payment Amount consists of four components: repayment of debt service obligations paid by Penn in excess of the agreed upon fair market rent . . . , the amount of real estate taxes Penn paid . . . , the value of any taxes due by virtue of Pirito's exercise of the option . . . . ; and asbestos remediation costs . . . .

Id. at 4-5.[7]  Pirito further argues that "[t]he SPA is not indefinite because the parties actually calculated the Real Property Payment Amount."  Id. at 5 (emphasis in original).

We agree that the contract was valid in that it provided a process for determining the Real Property Payment Amount.  But that process was not self-executing, and so even using the definition of "containing all essential terms" Pirito's expert advances, the contract was still incomplete. The parties apparently recognized the incomplete nature of the option when they formed the contract since if the terms were fixed and not susceptible to dispute, the provision for determination of the Real Property Payment Amount by a third party would have been unnecessary.  Instead, the contract contemplates possible disagreements regarding the value of the categories described in clause (Y): the contract provides that after Penn World submitted a Real Property Payment Amount to Pirito, if Pirito disagreed with the amount the parties were to negotiate the matter in good faith for fifteen business days.

---

[7] Pirito omits from this calculation the provision under § 2(f)(vii) that the Real Property Payment Amount would be increased by "outstanding amounts owed at the end of the three-year period by the Seller to the Buyer."  § 2(f)(vii).  This adds an element of incompleteness to the Real Property Agreement, but because the parties did not even reach an agreement on the four items Pirito does mention (as we discuss below), we need not address the impact of § 2(f)(vii) in order to find that the contract was incomplete.

If "no resolution can be reached by the end of such period," §
2(f)(iii), either party, or both parties, were to submit the
decision as to the proper Real Property Payment Amount to an
arbitrator.

We find as a matter of law that the contract was valid
but that the option was incomplete.  Pirito's exercise of the
option bound the parties to engage the process contemplated
under § 2(f)(iii) to finalize their future contract.

b.   The Parties'
Performance Under the Contract

We must consider whether there exists any record
evidence that creates a genuine issue of material fact as to
whether the parties discharged their duties with regard to the
Real Property Payment Amount, thus giving rise to Penn World's
supposed obligation to cause M.A.E. to sell the real property to
Pirito.

Pirito argues that when Penn World on March 17, 2005
provided its calculation of the clause (Y) elements of the Real
Property Payment Amount, "Pirito agreed with this calculation
and sought to move forward with his purchase of the Property."
Pl. Resp. at 5-6.  Thus, according to Pirito, the failure to
arbitrate the Real Property Payment Amount is inconsequential

27

because "the parties did not dispute the calculation of the Real Property Payment Amount and did not have anything to arbitrate under Section 2(f)(iii)." Id. at 6. Pirito argues that the arbitrator was to determine the Real Property Payment Amount "as computed in accordance with clause (Y)", § 2(f)(iii), and the dispute as to the Real Property Payment Amount "centered on Penn's inclusion of amounts purportedly owed under Section 2(f)(vii), not amounts owed pursuant to Section 2(f)(iii) to which the arbitration provision applied." Pl. Resp. at 7.

In considering Penn World's motion for summary judgment, we must draw all reasonable inferences in favor of Pirito, the non-moving party. Pirito supports his contention that the parties reached a resolution as to the clause (Y) elements by pointing to two items: first, he argues that the fact "[t]hat neither party sought arbitration further evidences the parties' agreement on the calculation of the Real Property Payment Amount." Id. at 6. This question-begging assertion hardly supports the inference that the parties affirmatively reached an agreement as to the Real Property Payment Amount. Second, Pirito cites his recent deposition testimony in which he stated that he agreed with the calculations regarding debt service and taxes. Pirito has no choice but to rely on those

recent statements because no communication contemporaneous with the negotiation period exists that could be read to demonstrate his assent to Penn World's proposed figures for clause (Y).  As we have rehearsed, Pirito's lawyers wrote at that time that Pirito "reserves his position with regard to the amounts claimed by way of debt service obligations and real estate taxes". March 23, 2005 Letter, Def. MSJ Ex. 10.

This argument fails for two reasons.  Most importantly, there is no evidence that Pirito communicated to Penn World his assent to Penn World's clause (Y) figures during or soon after the negotiation period.  There is <u>no</u> record evidence that the parties reached a resolution as to the price within the meaning of § 2(f)(iii).  Second, though the arbitrator's task was apparently to decide the price under clause (Y), the "resolution" § 2(f)(iii) contemplates is broader, for it is a resolution with regard to the Real Property Payment Amount as a whole, which, by the terms of the contract, includes any "amounts owed" under § 2(f)(vii).  The inference that the parties reached an agreement as to the Real Property Payment Amount is simply not reasonable in light of the evidence before us.

We thus find that Pirito has shown no genuine issue of material fact as to whether the parties reached an agreement about the Real Property Payment Amount in that he has given us no basis on which to infer that they did.  Because the record demonstrates the parties did not reach a resolution, the party wishing to pursue the real property sale was obliged under the terms of the contract to submit the question of the Real Property Payment Amount to an arbitrator -- which it is undisputed that <u>neither</u> party did.  Penn World's obligation to cause M.A.E. to sell the real property thus never arose, and so Penn World was not in breach of the contract.  We will therefore grant the Penn entities' motion for summary judgment with regard to Pirito's claims.[8]

### 2.   Effect on Pirito's <u>Motion for Summary Judgment</u>

Pirito moves for summary judgment on Counts I and II of his complaint and for summary judgment on Counts I, II, and IV of the Counterclaims.  Our conclusion that Penn World was not in breach of § 2(f) of the SPA necessarily resolves Pirito's motion for summary judgment on the counts in his complaint.

---

[8] As we described in footnote 2, <u>supra</u>, Penn Engineering is liable here only by virtue of its guarantee of Penn World, and so our finding that Penn World did not breach the contract also means that Penn Engineering is not liable.

Because, as we discuss below, we will grant Penn World's request to dismiss Counts I and IV of the Counterclaims without prejudice, we will not consider Pirito's motion for summary judgment with regard to these claims.  Our analysis below resolves Pirito's motion for summary judgment with regard to Counterclaim Count II.

### 3.   Penn World's Motion for Summary Judgment on Counterclaim Count II

Count II of the Counterclaims concerns Pirito's alleged breach of contract (§ 2(d)) and the lapse of the option (§ 2(f)).  Def. Ans. ¶¶ 180-84.

Penn World contends that our determination here about Pirito's breach of § 2(d) is governed by the September 18, 2009 Final Award of the Italian arbitrators and the January 16, 2013 decision of the Court of Appeals of Milan confirming that Award.  According to Penn World, the September 18, 2009 Award, as confirmed, establishes conclusively that Pirito breached § 2(d) of the Agreement and has remained since February 5, 2013 in breach of his obligation to repay the Net Worth Deficit and this collaterally estops Pirito from arguing otherwise.

In our Memorandum, we addressed at length the procedural history of the parties' arbitration efforts.  Pirito,

833 F. Supp. 2d at 463-66.  We will not rehearse that history again except to briefly explain that the parties' dispute resulted in four Italian arbitration awards, one in 2007, one in 2008, and two in 2009.  On February 13, 2009, the second arbitration panel issued a partial award in which the majority concluded that "[t]he Tribunal has jurisdiction on the claim of the Claimant for the Net Worth Deficit as formulated in the Request for Arbitration."  Feb. 13, 2009 Partial Award, Def. MSJ Ex. 39 at 25.  On September 18, 2009, the second arbitration panel issued a final award in which it found that "[t]he conclusions of the Del Prete Report are valid, final and binding upon the Parties" and ordered that (1) "Pirito shall pay to Pennengineering World Holdings LP the amount of €1[,]485,677 plus interest at the Euro Libor (one month) as reported in the Wall Street Journal as from 5 February 2003 until full and complete payment", (2) "Pirito shall pay to Pennengineering World Holdings LP the amount of €40,935.66 as participation to Mr Del Prete costs and fees, plus interest at the legal rate as from 9 January 2008 until full and complete payment", and (3) Pirito shall pay Penn World "(i) €50,000 as compensation for costs and fees incurred in connection with the procedure of Volontaria Giurisdizione; (ii) €60,000 as compensation for costs

32

and fees incurred in connection with the arbitration
proceedings; (iii) €105,269.31 as participation to the
arbitration costs."  The panel also dismissed "[a]ny and all
other claims by the Parties."  Sept. 18, 2009 Final Award, Def.
MSJ Ex. 40, at ¶ 116; p. 32.  Pirito appealed both the partial
Award and the Final Award, and on January 16, 2013, the Court of
Appeals of Milan rejected the appeals and "entirely confirmed"
both the partial and the Final Award.  Judgment, Court of
Appeals of Milan, Def. Effect of Jdgmt Br. Ex. A at 18.

### 4.   Whether the Arbitration Has Collateral Estoppel Effect

        As Penn World explains, in our Memorandum we
considered the collateral estoppel effect of the September 18,
2009 award.  In the motion for partial summary judgment then
before us, Penn World had argued that the September 18, 2009
award should have preclusive effect because it met the
requirements for a foreign judgment under Hilton v. Guyot, 159
U.S. 113 (1895) and satisfied the requirements of collateral
estoppel.

        Because of the significance of these two tests to our
determination here, we will restate each.  As we noted in our
Memorandum, under Hilton United States courts hold foreign money

33

judgments "conclusive upon the merits tried in the foreign court" so long as the judgment was "rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record".  159 U.S. at 159.

As we explained in our Memorandum, the parties agree that Pennsylvania law governs the collateral estoppel issue here.  Pirito, 833 F. Supp. 2d at 473 n.7.  Under the Pennsylvania doctrine of collateral estoppel, parties may not re-litigate facts or legal issues that earlier actions have resolved so long as (1) "the issue decided in the prior adjudication [was] identical to the one presented in the later action," (2) the earlier action resulted in "a final judgment on the merits", and (3) "the party against whom the doctrine is asserted [was] a party or in privity with a party to the prior adjudication" and had "a full and fair opportunity to litigate the issue in question in the prior action."  Sebrowski v. Pittsburgh Press Co., 188 F.3d 163, 169 (3d Cir. 1999) (citing Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 548 (3d Cir.

1999), which quotes Safeguard Mutual Ins. Co. v. Williams, 463
Pa. 567, 574 (Pa. 1975)).

In our Memorandum, we noted three concerns with giving
the February 13 and September 18, 2009 arbitration awards
preclusive effect: first, we explained that in light of the
"well-reasoned dissent to the Second Arbitration Panel's
February 13, 2009 Partial Award on Jurisdiction", we lacked
confidence that the arbitral tribunal satisfied Hilton's
jurisdictional prong.  Pirito, 833 F. Supp. 2d at 475.  Next, we
observed that the comity concerns that oblige courts to
recognize foreign courts' judgments under Hilton do not apply
with the same force to arbitration proceedings.  Id. at 475-6.
We noted, however, that the "respect for the capacities of
foreign and transnational tribunals, and sensitivity to the need
of the international commercial system for predictability in the
resolution of disputes" that the Supreme Court recognized in
Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473
U.S. 614 (1985) might counsel in favor of applying Hilton to
arbitration decisions.  Pirito, 833 F. Supp. 2d at 476 (quoting
Mitsubishi, 473 U.S. at 629).

Ultimately, it was our concern that the September 18,
2009 arbitration award did not constitute a final judgment under

35

the collateral estoppel test that then led us to deny the award's preclusive effect.  <u>Pirito</u>, 833 F. Supp. 2d at 477.

Penn World now (unsurprisingly) argues that "the Milan Court of Appeals' Judgment of Confirmation confirming both the 2/13/09 and 9/18/09 Awards addresses and resolves each of the three problems . . . and satisfies the requirements of the <u>Hilton</u> test and the requirements for finality for purposes of collateral estoppel."  Def. Effect of Jdgmt Br. at 8.

According to Penn World, the Judgment of Confirmation resolves the jurisdictional concern we raised.  In his appeal, Pirito argued that the arbitral tribunal lacked jurisdiction to resolve the dispute.  <u>See, e.g.</u>, Judgment, Court of Appeals of Milan, Def. Effect of Jdgmt Br. Ex. A at 5-6.  The Court of Appeals of Milan found that in his jurisdictional challenge Pirito "ha[d] not identified the violation of any of the rules (of substance) that govern the interpretation of contract terms (including the arbitration clause) consecrated by consent of the parties and relevant in this case", <u>id.</u> at 15, and so the court rejected this challenge.  In our previous Memorandum we noted that "[t]he interests of comity that the Penn entities espouse suggest that we should defer to the Italian court where Pirito is prosecuting his appeal of the Second Arbitration panel's

jurisdiction rather than arrive at an independent determination" as to the Arbitration Panel's jurisdiction.  Pirito, 833 F. Supp. 2d at 475 n.9.  Now that the Court of Appeals of Milan has ruled on the issue, our jurisdictional concern is fully satisfied and resolved.

Penn World also contends that the Court of Milan's decision negates our concern that Hilton may not extend to decisions of arbitral bodies: "With the issuance of the Court of Appeals of Milan's Judgment of Confirmation affirming the 2/13/09 and 9/18/09 Awards, there can be no doubt that these awards are now the subject of the judicial act of another nation and merit comity."  Def. Effect of Jdgmt Br. at 10.  We agree, and find that the Judgment of Confirmation satisfies the Hilton requirements.

We turn now to the finality of the decision -- the concern that ultimately led us to deny preclusive effect to the arbitration awards when we last considered the issue.[9]  We note that if final, arbitration proceedings have collateral estoppel

_____

[9] As Penn World points out, in Pirito's submission opposing Penn World's motion for partial summary judgment that we considered in rendering our earlier Memorandum, Pirito admitted that the arbitrations satisfied the collateral estoppel requirements of identity of issues and similarity of parties. See Pl. Resp. to Def. MPSJ at 15; Def. Effect of Jdgmt Br. at 11.
.

effect in Pennsylvania.  See, e.g., Witkowski v. Welch, 173 F.3d 192, 199 (3d Cir. 1999).  Penn World argues that in light of the judgment of the Milan Court of Appeals, "the judicially confirmed arbitration awards and the Court of Appeals of Milan's judgment are entitled under Pennsylvania law to treatment as final judgments for collateral estoppel purposes unless or until the Judgment of Confirmation is reversed."  Def. Effect of Jdgmt Br. at 11-12.  Pirito, without briefing us on whether he acknowledges the Milan Court's decision as final for collateral estoppel purposes, informs us that "the deadline to appeal the Decision to the Italian Supreme Court is June 13, 2013 and [he] has not yet determined whether to file such appeal."  Pl. Apr. 5, 2013 Letter.  Given the uncertainty about whether Pirito will in fact file a further appeal, we will assume that he will.

In Shaffer v. Smith, 543 Pa. 526 (Pa. 1996), the Pennsylvania Supreme Court held that "[a] judgment is deemed final for purposes of res judicata or collateral estoppel unless or until it is reversed on appeal."  Id. at 530.  In the motion for partial summary judgment we considered in our earlier Memorandum, Penn World argued that under Shaffer the Arbitration Awards should be given collateral estoppel effect.  We disagreed, finding that because Shaffer "referred to

'judgment[s]' and 'state court judgment[s]' in its holdings, it is by no means clear that it meant it should apply to arbitral awards as well." Pirito, 833 F. Supp. 2d at 477.

Penn World now urges that "the present Judgment of Confirmation is a judicial decision confirming the awards", Def. Effect of Jdgmt Br. at 12, and thus Shaffer squarely governs. We agree. Where a foreign court has rendered a judgment that meets the Hilton test, there is no reason to believe that the Pennsylvania courts would not apply the Shaffer principle that such judgment is final for collateral estoppel purposes unless and until it is overturned on appeal. This finding is consistent with the interests collateral estoppel protects: "reliev[ing] parties of the cost and vexation of multiple lawsuits, conserve[ing] judicial resources, and, by preventing inconsistent decisions, encourage[ing] reliance on adjudication." Shaffer, 543 Pa. at 531-32 (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)). Moreover, as our Court of Appeals explained in interpreting Shaffer, the contrary result would undermine the aims of collateral estoppel: "allowing a pending appeal to bar the operation of collateral estoppel would frustrate the doctrine's purpose of preventing the protraction

39

and duplication of litigation." <u>Rutter v. Rivera</u>, 74 Fed. Appx. 182, 187 (3d Cir. 2003).

We thus find that the judgment of the Court of Appeals of Milan is entitled to collateral estoppel effect, and we turn to the impact of that finding on this litigation.

     5.    The Effect of the Judgment of the Court of
<u>Milan and the Confirmed Arbitration Awards</u>

Penn World argues that one of the issues that the arbitral tribunal determined -- and the Court of Appeals of Milan confirmed -- was that Pirito breached § 2(d) of the Agreement.  As we discuss above, Pirito does not challenge that the issues decided in the September 18, 2009 arbitration award are the same issues present here, nor does he dispute that he, as a party to that proceeding, had a full and fair opportunity to litigate his claims.  Having found that the judgment of the Court of Appeals of Milan confirming the awards was final for collateral estoppel purposes, we must determine whether the arbitral tribunal found that Pirito breached § 2(d).

We will therefore first consider the provision of § 2(d) that Penn World alleges Pirito breached.

Section 2(d) provides for a minimum Net Worth of €815,821 and establishes that if the actual Net Worth as of the date of closing is ultimately found to be less than that amount,

> (i) the Purchase Price shall be retroactively and immediately reduced by an amount equal to the amount ("Net Worth Deficit") by which the Net Worth at Closing is less than the Minimum Required Net Worth, and (ii) an amount equal to the Net Worth Deficit shall become immediately due and payable to the Buyer from the Seller, such amount being payable first from the Escrow,

41

> and, if in excess of the Escrow, then by the
> Seller.

§ 2(d). If the parties cannot agree on the Net Worth Deficit, "the dispute[] shall be referred to an independent public accountant satisfactory to the Buyer and the Seller, who shall be directed to determine the Net Worth of the Company . . . and the determination of such accountant shall be binding on the parties hereto." Id.

As we have discussed, the parties did not agree on an independent public accountant, nor did they undergo the process § 2(d) prescribes in the event of a disagreement. Instead, Penn World successfully petitioned the Tribunal of Milan to appoint an accountant, and that court appointed Del Prete. In our Memorandum we noted that Pirito found Del Prete not "satisfactory", and thus his report did not fit within the plain language of § 2(d), but we reserved the possibility that "refusal by one party to participate in the mechanism established by § 2(d) might justify recourse to use another mechanism for arriving at a binding determination of the net worth" -- a possibility about which Penn World had not briefed us at that point. Pirito, 833 F. Supp. 2d at 474 n.8.

Penn World now, through its expert, Rojas, argues that the appointment of Del Prete by the Tribunal of Milan was such a

mechanism that the Italian court would recognize and that would eventually produce a binding determination.  Rojas points to Art. 1473 of the Italian Civil Code, which provides for the determination of price by a third party.  Under Art. 1473, "[t]he parties can entrust the determination of the price to a third person designated in the contract or to be designated at a later date," and "if the parties do not agree on his appointment or substitution, the appointment is made, at the request of one of the parties, by the president of the tribunal of the place in which the contract was made . . . ."  Def. Effect of Jdgmt Br. Ex. 35.

Rojas points out that the Court of Appeals of Milan, in confirming the arbitration awards, recognized that Del Prete had been appointed pursuant to Art. 1473.  See, e.g., Opinion of Court of Appeals of Milan, Def. Effect of Jdgmt Br. Ex. A at 4, 6.  Rojas explains that under Italian law "the request to the President of the Tribunal to appoint, according to Art. 1473 I.C.C., the independent third party shall be considered a Ricorso in volontaria giurisdizione (Voluntary Jurisdiction Proceeding), in which case the order of the court serves as a perfect substitute of the consent of one party".  Rojas Third Aff., Def. Effect of Jdgmt Br. Ex. B at ¶ 50.  The order

appointing the expert is thus "considered an exact equivalent of the consent that one of the parties, failing to perform the contract, refused."  Id. at ¶ 51. In light of this, the determination of Del Prete would be considered binding on the parties under § 2(d).

Indeed, in its Final Award the arbitral tribunal adopted this interpretation of the law where it found that "there is no question that the Del Prete Report is to be characterized as a determination (Arbitraggio) pursuant to Article 1349 c.c.," and, as such, the Del Prete Report "is binding upon the Parties unless it is 'manifestamente iniqua o erronea'", Sept. 18, 2009 Award, Def. MSJ Ex. 40, at ¶¶ 93, 96. The panel then considered whether the Report was manifestly unjust or erroneous and found "no legal ground to declare invalid the conclusions of the Del Prete Report" and declared "[t]he conclusions of the Del Prete Report are valid, final and binding upon the Parties."  Id. at ¶¶ 114, 116.

As we discussed in our Memorandum, in the September 18, 2009 Arbitration Penn World asked the panel, inter alia, to "[c]ondemn the Respondent to pay the amount of €1,485[,]677, deriving from the determination of Mr Del Prete, with interest from the 5th February 2003 to the moment of payment at the

44

applicable Rate", Final Award, Sept. 18, 2009, Def. MSJ Ex. 40

at ¶ 52.1.  The panel found that

> The Parties having agreed that the reduction
> in the purchase price by the Net Worth
> Deficit would be retroactive, and the
> Closing having occurred as contractually
> agreed on 5 February 2003 . . . the Tribunal
> holds that the amount of €1,485[,]677 fell
> due on the date of the Closing.  Respondent
> does not dispute [this] due date as being
> the due date for the payment of the adjusted
> purchase price.

Id. at ¶ 127.  The panel noted that "[a]s to interest rate, this

has been determined in the SPA as being 'the Euro Libor (one

month) as reported in the Wall Street Journal . . . as of

December 31, 2002'" and thus concluded, "[a]s claimed by

Pennengineering and not challenged by Mr Pirito, this interest

will run as from 5 February 2003 until full payment."  Id. at ¶

128.  In its decision, the panel ordered Pirito to "pay to

Pennengineering World Holdings LP the amount of €1[,]485,677

plus interest . . . as from 5 February 2003."  Id. at 32.

        The panel thus determined that Pirito owed Penn World

the amount of €1[,]485,677 for the Net Worth Deficit -- as

determined by Del Prete -- and Pirito is estopped from

challenging this finding.  It is also undisputed that Pirito did

not pay Penn World when Del Prete issued his Report.  Thus,

accepting the arbitral tribunal's confirmed determination of what Pirito owes as binding, we find that Pirito breached § 2(d), and we will grant the Penn entities' motion for summary judgment on Count II of the Counterclaims.  As a corollary, we will also deny Pirito's motion for summary judgment on this claim.

### 6.  The Date of Pirito's Breach

Penn World argues that Pirito has "been in breach of his obligation to repay the Net Worth Deficit under [§ 2(d)] since February 5, 2003."  Def. Effect of Jdgmt Br. at 3.  This date is significant because Penn World argues that it "resolves adversely to Pirito his 'timing argument' . . . that he was not in breach when he sent the February 22, 2005 RE Notice Letter or on the February 5, 2006 date set for transfer of the Real Property (because his payment obligation arose later)."  Id. at 4 n.5.

We find no support for the argument that Pirito breached on February 5, 2003 in either the contract or in the tribunal's decision.  The post-closing adjustment in the contract was included to protect Penn World if the actual value of Maelux was lower than the minimum required net worth.  See SPA § 2(d).  Inherent in that purpose (and the escrow provisions

46

that support it) is the possibility that the value would be less than the minimum required net worth.  Section 2(d) provides a remedy for Penn World if the value is insufficient, but the fact of that insufficiency does not constitute a breach as of the closing date, as Penn World suggests.  Instead, under § 2(d) an amount equal to the net worth deficit becomes immediately due and payable upon its determination.  The closing date is significant because the net worth deficit measures what Penn World overpaid on that date, and so it drives the interest calculation, but the closing date is not the date of the breach.  If it were, any net worth deficit would render Pirito retroactively in breach, and this is not a logical reading of the contract.  Penn World has provided no Italian authority that would support its position, and Pennsylvania contract law counsels us to "adopt the interpretation, which under all of the circumstances of the case, ascribes the most reasonable, probable and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished."  Unit Vending Corp. v. Lacas, 190 A.2d 298, 300 (Pa. 1963); see also, e.g., Ress v. Barent, 548 A.2d 1259, 1262 (Pa. Super. 1988) (citing the Unit Vending Corp. standard).

47

In its final decision, the arbitral tribunal found that the parties "agreed that the reduction in the purchase price by the Net Worth Deficit would be retroactive" and so "the amount of €1[,]485,677 fell due on the date of the Closing", Final Award, Sept. 18, 2009, Def. MSJ Ex. 40 at ¶ 127, but the significance of this finding was not that Pirito had breached as of that date, but that interest would run as of that date, as the tribunal's order commands.  Id. at 32.

Because § 2(d) provides that the Net Worth Deficit will become "immediately due and payable" upon its calculation, we find that Pirito breached § 2(d) on October 12, 2007, when Del Prete produced his report, and when, it is not disputed, Pirito neither paid Penn World pursuant to § 2(d), nor put the funds in escrow pending resolution of his dispute of the Del Prete Report pursuant to § 2(e).  Pirito thus breached § 2(d), but not during the period of the real property transfer.[10]

### 7.  Remedy for Count II Of The Penn Entities' Counterclaims

In Count II of their Counterclaims, the Penn Entities ask that the Court "issue a Declaratory Judgment that the option

---

[10] We note that § 2(f) also imposed an obligation on Pirito with regard to the disputed funds, and this obligation arose earlier than did that of § 2(e), but we need not address this determination in order to resolve the motions before us.

has lapsed and is of no further force and effect", which we will grant.  As we discussed above, because the parties failed to reach a resolution as to the Real Property Payment Amount, and neither party submitted the determination to an arbitrator pursuant to § 2(f), Penn World's obligation to cause M.A.E. to sell the property to Pirito never arose.  The option has thus lapsed and is of no further force and effect.

The Penn entities also ask that we enter a money judgment against Pirito for "all costs of maintaining and carrying the Real Property since February 5, 2006".  Count II, Def. Answer and Counterclaims.  Exercising the option to buy the real property under § 2(f) was entirely a matter of Pirito's discretion.  Pirito breached § 2(f) insofar as he failed to escrow the disputed amount on February 5, 2006.  However, had Pirito never exercised the option, though he would still have had to escrow the disputed amounts, Penn World would have borne the costs of maintaining and carrying the real property.  We thus find this remedy inappropriate.

### 8.   Dismissal Of Counts I and IV Of The Counterclaims Without Prejudice

Penn World requests that if we grant its motion for summary judgment "the remaining counterclaims be dismissed

without prejudice to reassertion if Pirito brings additional
legal proceedings or if the pending appeals of the Italian
arbitrations result in further proceedings".  Def. MSJ at 55.

      Penn World explains that it does not wish to pursue
these claims in this proceeding because

> [I]f Pirito's claims are dismissed, the
> single purpose for a trial of the fraud and
> breach of contract claims would be to
> recover damages over and above the existing
> $1.2 million judgment.  Assuming Pirito's
> claims that he is judgment proof are true,
> then Penn World would incur the costs of
> trial merely to add to an uncollectible
> judgment.  Even if Pirito's claims are
> false, the further delay of trial would only
> render collection of the existing $1.2
> million judgment more difficult than it
> already is.

Id. at 54.

      In the face of these compelling reasons for dismissal,
Penn World explains that it seeks dismissal without prejudice
out of fear that Pirito will continue to litigate these claims
outside of the United States:  "Pirito is currently appealing
the 9/18/09 Award . . . and to the extent he prevails, a whole
new set of proceedings is the likely result."  Id. at 55 n.32.

      As we rehearsed above, Pirito has represented to us
that he has not yet decided whether to appeal the judgment of
the Court of Appeals of Milan, but we agree with Penn World that

given the history of the case it would hardly surprise anyone if
Pirito "continue[d] to litigate and assert claims outside the
U.S." Id.  Penn World contends that it "should not be deprived
of its ability to assert its claims in such circumstances as,
for example, if Pirito wins on appeal, obtaining an entirely new
trial in Italy on the issues resolved . . . in the 9/18/09
Award." Id.

        Voluntary dismissal without prejudice pursuant to Fed.
R. Civ. P. 41(a)(2) "is within the sound discretion of the trial
court", and "a very significant number of courts have followed
the traditional principle recognized by the federal courts that
dismissal should be allowed unless the defendant will suffer
some plain legal prejudice other than the mere prospect of a
second lawsuit."  9 Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 2364 (3d ed. updated Apr.
2013).  See also, e.g., Kwan v. Schlein, 634 F.3d 224, 230-32
(2d Cir. 2011) (no abuse of discretion where court dismissed
defendants' counterclaims on a finding that plaintiff would
suffer no legal prejudice because the defendants did not intend
to pursue counterclaims unless the plaintiff prevailed on
appeal).

Here, we find that Pirito will not suffer any legal harm by dismissal without prejudice of these counterclaims as we credit Penn World's representation that it will only reassert these claims <u>if</u> Pirito continues to litigate the matter outside of the United States.  We will therefore dismiss Counts I and IV of the Counterclaims without prejudice.

III.  <u>Penn Entities' Motion for Costs</u>

The Penn entities also move us to require Pirito to (1) reimburse Penn World for $8,510 in costs Penn World says it incurred on Pirito's behalf during discovery, and (2) deposit an additional $23,476 in the Security Account now held in the Registry of the Court (for a total of $43,476) as security pursuant to Local Rule 54.1.  Def. Mot. for Costs at 1.  Much of (2) is mooted by this decision, and we will deny the motion without prejudice to its reassertion in light of this resolution.[11]

IV.  <u>Conclusion</u>

For the reasons discussed herein, we will deny Pirito's motion for summary judgment in all respects, grant the

---

[11] As to the adequacy of the $20,000 already in the Court's Registry, this more than suffices to cover the $8,510 in costs defendants claim as already incurred.  Any sum above this $8,510 is now nothing more than speculative.

Penn entities' motion for summary judgment, and dismiss without prejudice Counts I and IV of the Penn entities' counterclaims. Our judgment confirming the September 18, 2009 arbitration award will be made final and enforceable.  We will also deny the Penn entities' motion for costs without prejudice.  Lastly, we will deny as moot the Penn entities' motion for leave to file a reply brief in support of that motion.

BY THE COURT:


/S/ STEWART DALZELL, J.